In re ST. JOSEPH-CHICAGO S. S. CO.

THE EASTLAND.

(District Court, N. D. Illinois, E. D. December 23, 1919.)

No. 32231.

1. SALVAGE ⬥14—LIFE SALVORS WHO DID NOTHING TO AID VESSEL CANNOT SHARE IN SALVAGE AWARD TO ONE WHO RAISED VESSEL.

Where a vessel loaded with excursionists overturned in a narrow river and sank, life salvors, who performed their main services at the time of the accident, are not, under Act Aug. 1, 1912, § 3 (Comp. St. § 7992), known as the Salvage Act, entitled to share in the sums paid a wrecking company for raising and refloating the vessel; the work of the latter company being performed a considerable time after all services by the life salvors had been rendered, and the statute contemplating a divided service where

both lives and property were simultaneously imperiled and both are rescued about the same time.

2. SALVAGE ⚖=40—LAST SALVOR HAS PREFERENCE OVER FORMER SALVORS.

It is a well-recognized rule of maritime law that the last salvor is entitled to preference over former salvors.

3. SALVAGE ⚖=40—SALVOR OF VESSEL HAS PRIORITY OVER CLAIMS OF LIFE SALVORS.

A vessel loaded with excursionists capsized and sank, many persons being lost. Thereafter, under contract with the owners, it was righted and refloated; such services being performed a considerable time after the accident, and after life salvors had ceased to render any services. *Held* that, notwithstanding Act Aug. 1, 1912, § 3 (Comp. St. § 7992), relating to claims of salvors, the salvor of the vessel, having performed its services last, takes priority over claims of life salvors.

4. SALVAGE ⚖=40—SALVOR OF GEAR OF VESSEL HAS PRIORITY OVER LIFE SALVORS.

One who salvaged gear and other property of vessel, which had capsized and sunk with great loss of life, which gear and property was sold with the vessel, which was also salvaged and sold, has priority to the extent of his service over the claims of life salvors, who rendered their services at the time of the accident; the salvage of the vessel and gear occurring thereafter.

5. SALVAGE ⚖=45½, New, Vol. 9A Key-No. Series—NECESSITY OF PRESENTING CLAIMS FOR LIFE SALVAGE WITHIN TWO YEARS.

Under Salvage Act, § 4 (Comp. St. § 7993), providing that suit for remuneration for rendering assistance or salvage services cannot be maintainable, if brought later than two years from the date when such assistance, etc., shall have been rendered, life salvors cannot recover compensation for services rendered out of the fund resulting from the sale of the vessel, which, after having capsized, was righted and refloated, where they did not present their claims within two years after the time of rendering services, for the section creates a new right, and unless the claim is presented within the time fixed the right is lost.

6. SALVAGE ⚖=50—JUDGMENT IN FAVOR OF SALVOR AGAINST REPRESENTATIVES OF THOSE LOSING LIFE NOT CONCLUSIVE AGAINST CLAIMS OF LIFE SALVORS.

A judgment entered on a decision of the Circuit Court of Appeals, sustaining as a preferred lien the claim of the salvor of a vessel as against the claims of personal representatives of those who lost their lives in the accident, is not a conclusive adjudication against the claims of life salvors, who saved life at the time of the accident.

In Admiralty. In the matter of the petition of the St. Joseph-Chicago Steamship Company, owner of the steamer Eastland, for limitation of liability. On exceptions of the Great Lakes Towing Company to the amended claims of life salvors. Exceptions in part sustained, and in part overruled.

Goulder, White & Garry, of Cleveland, Ohio, and Wilkerson, Cassels, Potter & Gilbert, of Chicago, Ill., for Great Lakes Towing Co.

Edward Maher and Justus Chancellor, both of Chicago, Ill. (Charles S. Thornton, of Chicago, Ill., of counsel), for life salvors.

CARPENTER, District Judge. The steamer Eastland, heavily laden with excursionists, sank at its dock in the Chicago river on July 24, 1915. The loss of life was appalling. Through the magnificent and heroic efforts of the life salvors, intervening in this petition, the

lives of many men, women, and children were saved. The Eastland was fast to the dock at the time of the disaster, and for lack of proper ballasting turned over on her side, settled, and sank in 20 feet of water on the bottom of the Chicago river. As she lay on her side, a considerable part of the steamer was above the surface of the water, and she constituted an obstruction to the free navigation of the Chicago river; indeed, a menace to safe navigation.

It became the duty of the owners, under the law, promptly to raise and remove her. To this end, on July 27, 1915, the owner of the vessel entered into a contract with the Great Lakes Towing Company "to raise and deliver said steamer, righted and pumped out, to a dock in the vicinity where she lay sunk, for the sum of $34,500, no cure no pay." Under this contract the towing company began the work of raising the steamer on August 4, 1915, completed the work, and turned the steamer over to her owners on August 16, 1915.

On August 17, 1915, limitation proceedings were begun in this court by the owners of the steamer. The steamer was conveyed to a trustee appointed by the court, and on August 27, 1915, a monition issued, returnable the following December, requiring all persons having claims against the steamer Eastland, or her owners, arising out of the disaster of July 24, 1915, to file such claims on the return day of the monition. On September 1, 1915, the Great Lakes Towing Company filed its petition in this court setting up its contract for raising the steamer, the performance of the contract, and praying that it be paid $34,500, the price agreed upon. On December 15, 1915, the trustee of the court sold the vessel at public auction for $46,000, and that sum was paid into the registry of the court.

Many claims were filed in this proceeding by administrators of estates of people who lost their lives when the vessel capsized, and by other persons who suffered personal injuries or lost property at the same time. On behalf of these claimants objection was made to the payment of the claim of the Great Lakes Towing Company, and the District Court, on November 3, 1916, entered an order denying the payment of the claim of the Great Lakes Towing Company as a preferred lien claimant. On July 23, 1918, the Circuit Court of Appeals handed down an opinion, reversing the order of the District Court and remanding the cause, with directions to allow the towing company's claim, stating in the opinion:

"Since it affirmatively appears that appellant's claim is the only one of the preferred class, there is no reason for delaying payment."

On November 25, 1918, and March 24, 1919, applications for writs of certiorari in the Supreme Court of the United States to review the action of the Circuit Court of Appeals were denied. On March 29, 1919, the present claimants, the salvors of human life, so called, made an application to the District Court for leave to file an intervening petition in this proceeding, claiming a fair share of the remuneration allowed to the towing company for its service in raising and righting the steamer. On April 24, 1919, leave was given to the life salvors to file their claims.

On May 5, 1919, the District Court denied a motion of the Great Lakes Towing Company for a decree and immediate payment, on the ground that the mandate of the Court of Appeals merely directed it to allow the claim for raising the boat, together with interest and costs, but did not direct its allowance as a preferred claim against the life salvors. Exceptions were filed by the towing company to the amended intervening petitions of the life salvors, and the question presented here is whether the life salvors, performing their services on July 24, 25, and 26, 1915, may participate in the contract salvage allowance made to the Great Lakes Towing Company for raising the Eastland between August 4 and August 16, 1915, under the contract of July 27, 1915.

[1] The amended claims admit that all of the services rendered by the life salvors were performed on or before July 27, 1915. They make their claims under section 3 of the act of August 1, 1912 (37 Stat. 242), known as the Salvage Act (U. S. Comp. Stat. §§ 7990–7994 [9 Fed. Stat. Ann. (2d Ed.) 121]):

"Chapter 268. An act to harmonize the national law of salvage with the provisions of the international convention for the unification of certain rules with respect to assistance and salvage at sea, and for other purposes.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that the right of remuneration for assistance or salvage services shall not be affected by common ownership of the vessels rendering and receiving such assistance or salvage services.

"Sec. 2. That the master or person in charge of a vessel shall, so far as he can do so without serious danger to his own vessel, crew, or passengers, render assistance to every person who is found at sea in danger of being lost; and if he fails to do so, he shall, upon conviction, be liable to a penalty of not exceeding one thousand dollars or imprisonment for a term not exceeding two years, or both.

"Sec. 3. That salvors of human life, who have taken part in the services rendered on the occasion of the accident giving rise to salvage, are entitled to a fair share of the remuneration awarded to the salvors of the vessel, her cargo, and accessories.

"Sec. 4. That a suit for the recovery of remuneration for rendering assistance or salvage services shall not be maintainable if brought later than two years from the date when such assistance or salvage was rendered, unless the court in which the suit is brought shall be satisfied that during such period there had not been any reasonable opportunity of arresting the assisted or salved vessel within the jurisdiction of the court or within the territorial waters of the country in which the libelant resides or has his principal place of business.

"Sec. 5. That nothing in this act shall be construed as applying to ships of war or to government ships appropriated exclusively to a public service.

"Sec. 6. That this act shall take effect and be in force on and after July first, nineteen hundred and twelve."

The life salvors claim that they "are entitled to a fair share of the remuneration awarded to the salvors of the vessel, her cargo, and accessories," and that therefore the claim of the Great Lakes Towing Company ought not to be paid in full to their prejudice. The exceptions of the towing company are as follows:

"I. Said amended claim of Sherwood S. Mattocks for himself and others, and the other like claims, do not state a cause of action.

"II. It appears on the face of said claims as amended that the alleged services were rendered entirely disassociated from, independent of, and were prior

in time to the services of the Great Lakes Towing Company, and were in no manner connected with or related to the services rendered by said Great Lakes Towing Company.

"III. It appears on the face of said claims as amended that any such services alleged in said amended claims were of an entirely different character to, were prior in time to, and constituted no part of the services of the Great Lakes Towing Company, under its contract set forth in its petition in this cause and referred to in the libel and petition of the St. Joseph-Chicago Steamship Company, and likewise heretofore passed upon and adjudicated by the Circuit Court of Appeals in this cause, which said services of Great Lakes Towing Company are also referred to in said amended life salvors' claims.

"IV. It appears from said amended claims that the services of said life salvors, and all and each of them, were performed more than two years prior to the making or filing of any such claim, and no sufficient excuse or reason, under the statute, for said delay is given.

"V. The matters set up in said amended claims in behalf of said life salvors are foreclosed and made res adjudicata by the decision and decree of the Circuit Court of Appeals in this cause.

"VI. There is no substantial or material difference in the amended claims now filed from the original life salvors' claims filed by said Sherwood S. Mattocks and others, to which exceptions made by Great Lakes Towing Company have recently been sustained, so all matters and things set forth in these claims are res adjudicata by decision and order of this court.

"VII. There is palpable and manifest misstatement of fact in the amended claims as filed, of which this court will take notice from the files on record in this case, and from general knowledge of such matters, to wit: In the original claims of said Sherwood S. Mattocks and others, as life salvors, it was alleged on oath that the life salvors' services were performed on the day the said steamer Eastland tipped over and sank, to wit, on July 24, 1915, and this court will take judicial knowledge of the fact that any services rendered in the saving of human life connected with the sinking of the steamer Eastland would have to be rendered within a few minutes, or at most within a few hours, of the time said steamer tipped over and sank.

"VIII. There is an effort in the amended claims to ask for an award in favor of said claimants on account of the salvage of property, as to which the claimants have no standing in this court, both by reason of the decree and opinion of the Court of Appeals, and also by reason of former orders of this court."

First. It is admitted that the life salvors have no claim against the steamer, or the towing company, or the fund, save under the statute heretofore quoted. The Eastland, immediately after the catastrophe, while lying on her side on the bottom of the Chicago river, was in no further danger of destruction by the elements; that is to say, where she sank she was in a position to be raised without danger to the salvors. No effort was made at the time of the accident to save or protect the boat. When the services of the life salvors were rendered, the steamer had already safely settled in the mud at the bottom of the river in about 20 feet of water. The efforts of the life salvors were directed solely to saving from drowning the passengers and crew of the steamer. There was nothing to distract those salvors from their humane purpose. The statute, I think, presupposed possibly a divided interest, and probably a sordid interest, in the average salvor. It imposed penalties of fine or imprisonment, or both, upon the master or person in charge of a vessel who failed, so far as he could do so without serious danger to his own vessel, crew, or passengers, to render assistance to any person who was found at sea in danger of being lost. It also aimed to stimulate, or excite, at least as much effort

to save human life as ordinarily would be spent in saving vessel or cargo. The statute, however, presupposed an emergency where both lives and goods were at hazard, and aimed to encourage the saving of life. It is a sad reflection to contemplate this law. However, we may not inquire into the wisdom of Congress in its passage. Suffice it to say, the circumstances of this case do not bring it within the law. These life salvors were put to no choice between passengers and crew and cargo. They had no chance to hesitate in determining whether it was more profitable to save the ship, or the men, women, and children on board. What they did was inspired by the spirit which since Christendom has been the foundation of the great brotherhood of mankind. Their work was done, and well done. Their reward they have; it never can be taken from them, and it is measured by a standard greater than money. They would not have done less for great promises.

At the time the life salvors were performing their heroic deeds, no effort was made to save the steamer or its appurtenances. There was no time for that. The steamer could not have been saved, because she was then practically lost. All of the efforts of the life salvors would not have saved her. The purpose of the statute being to engage the interest of the life salvors at least equally between human lives and property, it can have no effect in a case where there was no association of effort or co-operation between those saving lives and those saving ship or cargo. The lives were saved before the contract was made to raise the boat; certainly before work was begun under that contract.

After all the lives possible were saved, the steamer was still lying at the bottom of the river a worthless wreck, an obstruction, a menace to navigation, which had to be removed. The boat at the bottom of the river was of no value, and a reading of the statute here involved shows clearly that it was intended to apply only to cases which might be termed "pure salvage"; that is, cases where the service was rendered voluntarily at the time of risk, and not under contract after the emergency had passed. The service here rendered was a wrecking service in the nature of a salvage service, but not in any sense "salvage," as understood in the statute. The Elfrida, 172 U. S. 186, 19 Sup. Ct. 146, 43 L. Ed. 413; The Annie, 6 Aspinall (N. S.) 117.

The statute in question was intended only to apply to cases where the vessel and cargo, together with her crew, including also passengers, were exposed to a common danger threatening their destruction and loss; to cases where service is rendered by a volunteer adventurer, and such service is successful in saving lives and property, consisting either of the cargo, the vessel, or both. The services rendered in the saving of lives were to be considered when remuneration for salvage was awarded, so that they might participate in and be given a part of any sum paid for saving the vessel or other property. In such a case, the life salvor, by virtue of his service rendered at the time that the property was saved, became a cosalvor, with a right to recover compensation for a service, when, under the general maritime law, he would get nothing. It was for the purpose of enabling such a salvor to recover for his services that the statute was passed. It was

not intended that, as between different sets of salvors, the life salvor was to participate in awards which might be made for services rendered months, and even years, after the life-saving service had been performed.

The salvage service in saving life, to be compensated for under this statute, must have been performed substantially at the time and while both lives and property were in distress and danger of loss; not, of course, at the same instant of time, but during the period of peril. The life salvors, therefore, are not entitled, under the statute, to any part of the contract price awarded to the towing company for raising and righting the Eastland.

[2, 3] Second. The claim and lien of the towing company, being for services last in point of time, is paramount and preferred over all others, including those of the life salvors. The life salvors rendered their services on the day of the disaster and the two days following, and we may assume that those services were fully accomplished some days before any attempt was made to raise the steamer. We have, then, this situation: All of the lives saved that could be, and the steamer lying on the bottom of the Chicago river, an obstruction to navigation, and of no value to any one as she lay there. The towing company entered into its contract to raise the boat on July 27, 1915; began work on August 4, 1915; completed the contract and turned the ship over to the owners on August 16th of that same year. The services, therefore, of the towing company were subsequent in point of time to those of the life salvors. There was no connection between the services of the towing company and those of the life salvors. The life salvors had no claim for their services against anybody at the time they were rendered. The towing company was engaged in the wrecking business on the Great Lakes, and was under no obligation, legal or moral, to raise the steamer; and if it had not done the work successfully under its contract there would have been no property to sell, and no fund, or at least a very small one, for distribution. Nothing that the life salvors did contributed to the success of the subsequent service rendered by the towing company.

It is a well-known rule of the maritime law of the United States that the last salvor is entitled to preference over the first or former salvors. The two services, namely, life-saving service and wrecking service, were rendered at different times, and were not allied in any way. The first service in no way helped the second service, or preserved any of the property that was finally salved by the towing company. As priority, in point of logic, depends upon the rank of benefits conferred, so, therefore, must the towing company's claim be preferred to the claims of the life salvors. As the Court of Appeals said in this case (Great Lakes Towing Co. v. St. Joseph-Chicago Steamship Co., 253 Fed. 638, 165 C. C. A. 264):

"But, after all, it is unnecessary that appellant's service be defined as salvage. Maritime liens arise from many kinds of acts and services, and priority is determined by rank of benefits conferred. The John G. Stevens, 170 U. S. 113, 18 Sup. Ct. 544, 42 L. Ed. 969. Appellees' liens, if any they have, attached to the Eastland as she lay on the bottom of the river at the end of

her voyage. Appellees, as well as the owner, were benefited by appellant's service, and their claims are therefore subordinate."

See, also, Hughes on Admiralty, p. 331; Kennedy on the Law of Civil Salvage, p. 8; The Veritas, 9 Aspinall (N. S.) 237.

The life salvors' claims, like the death and accident claims, under consideration in Great Lakes Towing Co. v. St. Joseph-Chicago Steamship Co., supra, attached to the Eastland as she lay on the bottom of the river. As she thus lay, she was subject to claims of various kinds, and among those who were entitled to a fair share of the remuneration awarded to the salvors of the vessel were the life salvors. But the Eastland, lying at the bottom of the river, could not pay. To make her valuable she had to be raised, pumped out, and righted. To secure that value, the contract with the Great Lakes Towing Company was made; and if the well-recognized principle of maritime law, which the courts have announced, that priority among various claimants depends upon the order in which the services are rendered, were not the law, no one could have been secured to raise the Eastland. Men were employed, materials were purchased, time and effort were spent, in order to raise that boat, and it cannot be that the company which did that work at its convenience, under contract, and safely delivered the boat at the dock for the benefit of all concerned, is not entitled to its outlay and fair compensation for its services—in this case, the contract price. If this work had not been done, there would have been nothing available for claimants of any class. Clearly section 3 of the Salvage Act does not affect the priority of claims as settled in the Maritime Law. The life salvors were entitled only "to a fair share of the remuneration awarded to salvors" of the same rank, and not as to salvors whose claims were entitled to priority.

[4] Suggestion is made that some part of the fund derived from the sale of the Eastland should be withheld from contributing to the claim of the Great Lakes Towing Company because one Capt. Walter Scott saved some $8,000 worth of property, which was sold as a part of the vessel, and for which he was allowed $500 as salvage. It appears that, beginning with August 4th, and up to August 16th, long after the accident, Capt. Scott picked up in the Chicago river various parts of the equipment of the Eastland. That equipment was returned to the boat, and when the boat was sold was disposed of with it. At the most Capt. Scott and the towing company were cosalvors; the one raising the wreck, and the other saving certain goods which got loose and floated down the river. It cannot for a moment be argued that they were cosalvors with those who saved human lives. Inasmuch as the boat and its apparel were sold together, there is no way of determining what the part of the property saved by Capt. Scott was sold for, and what the property saved by the towing company brought. The District Court awarded Scott what it thought was reasonable for the service he performed for the benefit of the steamer Eastland, and this sum was paid to him out of the proceeds of the sale. No objection was made by any one interested; no application was made to sell separately the property saved by Capt. Scott. The services rendered were treated as services for the benefit of the whole steamer, which in-

cluded the hull and all the different parts of the ship, boats, tackle, apparel, and furniture.

Capt. Scott had a lien not only upon what he actually saved, but upon the whole vessel, which included what he saved. The towing company rendered its service in saving the Eastland, and that included everything that belonged to her and had always been a part of her. The life salvors have no more claim against the property saved by Scott than they have against the property saved by the towing company.

[5] Third. It is provided by section 4 of the act, upon which the life salvors base their claim:

"That a suit for the recovery of remuneration for rendering assistance or salvage services shall not be maintainable if brought later than two years from the date when such assistance or salvage was rendered."

Under this statute the time for filing claims against the Eastland expired on July 25, 1917. The steamer practically came into the custody of the court on the 16th day of August, 1915, and after the sale in December, 1915, the proceeds were placed in the registry of this court, where they still remain. The towing company filed its claim on September 1, 1915. The monition advised the world of the pendency of proceedings. The life salvors, or at least most of them, resided in Chicago, and had ample opportunity to file their claims at any time, and were given every right to do so. They took no part in the trial of the case of the towing company to recover its claim in the District Court. They took no part in the hearing of the case in the Circuit Court of Appeals, and they were heard of for the first time, so far as this court is concerned, on March 29, 1919, more than three years after their services were rendered, and more than three years after the towing company had filed its claim, and more than two years after the hearing of the towing company's case in this court. They are therefore not within the two years provided by the statute.

The act of Congress under which these life salvors proceed created a new cause of action. "A statute which in itself creates a new liability, gives an action to enforce it unknown to the common law, and fixes the time within which that action may be commenced, is not a statute of limitations. It is a statute of creation, and the commencement of the action within the time it fixes is an indispensable condition of the liability and of the action which it permits. Such a statute is an offer of an action on condition that it be commenced within the specified time. If the offer is not accepted in the only way in which it can be accepted, by a commencement of the action within the specified time, the action and the right of action no longer exist, and the defendant is exempt from liability." Partee v. St. Louis & S. F. R. Co., 204 Fed. 970, 123 C. C. A. 292, 51 L. R. A. (N. S.) 721, and cases cited.

It is, however, now contended that inasmuch as no claim is made against the steamer or her proceeds directly, but only against the amount awarded to the towing company, that the two-year limitation in the statute does not apply until after the award to the towing company had been established, and it is argued that until the decision of the

Court of Appeals on July 23, 1918, the right of the towing company to recover for its services had not been determined, and that therefore the life salvors had until July 23, 1920, to file their claims for a fair share of the remuneration awarded to the towing company.

The language of the statute is plain, and not in any degree ambiguous or doubtful. On the day their services were rendered the life salvors had some sort of claim, present, contingent, inchoate, or otherwise, and they were bound, under the law, to present that claim to this court where the limitation proceedings were pending. They have not brought themselves within the exception noted in section 4, and no explanation is made of the reason why they were late in asking for relief. Indeed, I am of the opinion that, inasmuch as the fundamental law required the claims to be filed within a certain time, no explanation would excuse the delay. The court is powerless, under the language of the act, to grant an extension of time beyond the two years, except as provided by the statute, and this case does not come within that exception.

This argument of the life salvors is very seductive for the moment, but an analysis of the statute must demonstrate that it is unsound. It is conceded it was the purpose of Congress to grant some compensation to the salvors of human life. It cannot for a moment be supposed that it was put in the power of the salvors of the vessel or the cargo to defeat the claim of the life salvors. Those saving the vessel or the cargo might make a private settlement with the owner with reference to salvage. Clearly that ought not to defeat any claim of those who saved lives. A reasonable construction of the statute would permit the salvors of human life, in the absence of the salvors of the vessel and the cargo, to appear in the District Court having jurisdiction over the vessel or its proceeds, stating in their petition that salvage services were rendered the vessel and the cargo on the occasion of the accident, and ask that the owners or claimants of the vessel be required to pay to them a fair share of the remuneration which was earned, or ought to be paid to the salvors of the vessel and the cargo. The vessel and cargo salvors could be made respondents, and cited into court to show cause why, as cosalvors, those saving human lives should not participate in the total remuneration for services rendered. Indeed, such a petition filed would prevent private settlement by the owner and the vessel salvors, or would permit it at the owner's risk of making fair compensation to the life salvors in addition to the private settlement.

In any event, the statute created a new liability, gave a new cause of action, and it cannot be presumed that it was intended that the liability or right of action should be dependent upon the conduct of others. Of course, if there were no other salvage services rendered than the saving of human lives, no remuneration could be recovered under the statute; but, granting that in the emergency on the occasion of the accident services were rendered which resulted in the saving of the vessel or cargo, the salvors of human life, acting during the same peril, were entitled to compensation, to remuneration, at least to some extent, and their right to claim it in this court is clear. This being my construction of the statute, it follows necessarily that under section

4 the claimants here have failed to comply with the conditions prescribed by Congress under which they were permitted to be compensated for their services.

[6] Those exceptions to the libel which amount to a general demurrer to the claim of the life salvors, and the exceptions raising the point that the claims were not filed in time, are sustained. The exceptions involving res adjudicata are overruled.