**Charles B. KANE d/b/a Kane's Diesel & Truck Repair, Plaintiff,**

v.

**MOTOR VESSEL LEDA, her engines, her boiler, furniture, gear, tackle and apparel, in rem and Leda Towing Company, Inc. in personam, Defendants.**

Civ. A. No. 70–313.

United States District Court,
E. D. Louisiana,
New Orleans Division.

March 14, 1972.

Second Hearing Oct. 27, 1972.

Louis R. Koerner, Jr., New Orleans, La., for plaintiff.

Rene S. Paysse, New Orleans, La., for defendants.

ALVIN B. RUBIN, District Judge:

## I. FACTS

On October 31, 1969, Leda Towing Company, Inc. ("Leda") and Joseph J. Poirier ("Poirier") executed two documents with reference to the Motor Vessel LEDA. One purported to be a bareboat charter; the other purported to be an option to purchase. The two documents, read together as they must be, since they were executed simultaneously, resembled an agreement of the kind commonly called a lease-purchase contract. The 60 monthly payments, denominated rental, amounted to the full price of the vessel, and if Poirier, the lessee, performed the so-called lease, he would acquire ownership of the LEDA.

Shortly before this transaction, Charles Kane ("Kane"), who was in the diesel repair business, had begun to repair one of the two engines on the vessel, a GMC V-12. The repairs were com-

pleted early in November, and, despite the fact that Kane had given an estimate that the repairs would cost $1,500, he rendered a bill for $5,047.33. In oral findings of fact, the court has determined that Leda never agreed to pay more than the $1,500 originally agreed on, and that this sum has been paid. Leon and David Vial, Leda's incorporators and majority shareholders, never agreed to pay anything personally.

Sometime later, Poirier advised Kane that he was having problems with the V–12 engine, and Kane sent a mechanic aboard to attempt to remedy the problem. Leon Vial knew of the difficulty, spoke to Kane, and urged him to take care of it, under the impression that the problem was being caused by faulty work on the repair job. In fact the engine had been worn out before it was repaired, and needed to be replaced. This should have been evident when the repair work was done, and the repairs should not have been undertaken. But, after the repairs were completed, as the result of the engine's age, the engine threw a rod and was damaged beyond further repair.

The LEDA had two engines, the GMC V–12 and a Waukesha engine. The Waukesha also needed repairs and Leda authorized Poirier and Kane to take parts for it from an extra Waukesha engine on Leda's property. When the GMC V–12 threw a rod, and it became necessary to replace it, Poirier decided also to replace the Waukesha engine with a new V–12. He told Leon Vial of his plans, and Vial responded, "Fine, but it's none of my business. You pay for it," or words to that effect.

The Waukesha was replaced by a V–12, leaving the LEDA with two new V–12's, both of which thereafter functioned satisfactorily. American Marine Corp., through Westside Auto Supply, furnished the basic parts for the new engines at a price of $23,283.92. The ad-

ditional parts were supplied by Kane through other suppliers, their costs totalling $1,381.66. Kane's bill for services in installation was $4,200 and this was a reasonable sum.[1]

## II. PERSONAL CONTRACTUAL LIABILITY OF POIRIER AND LEDA

■■■ As Poirier contracted for the installation of the engines and received what he bargained for, he is clearly liable for these sums. To determine whether there is any liability on Leda's part, it is necessary to examine the document captioned "Bareboat Charter Party." It provides "that repair of all engines, gear, and equipment necessary or proper upon delivery of the vessel to CHARTERERS shall be deemed chargeable to causes antedating delivery of vessel to CHARTERERS, unless OWNER and CHARTERERS agree otherwise, and the cost involved shall be for the account of OWNER. . . ." Par. 3b. Since the engines were in fact defective when the M/V LEDA was delivered to Poirier, it seems clear that he would have had an action against Leda Towing Company for the expense of their repair. But this would not create liability by Leda Towing directly to the supplier. Leda Towing did not contract with Kane; Kane was not a third party beneficiary of the Leda Towing-Poirier contract (nor, in Louisiana terms, did that agreement contain a stipulation pour autri). Hence, though there may be a debt from Leda Towing to Poirier, Leda is not liable to Kane.

## III. LIEN AGAINST THE M/V LEDA

It is necessary to look at the agreement between Poirier and Leda to determine whether the claim by Kane constitutes a lien on the vessel. The legal principles that apply to the problem are well settled. Despite protestations of its antiquity, the maritime lien was created

---

[1]. The vessel was later sold by Leda to the Vials and the evidence indicates that the corporation is insolvent. Therefore unless there is a lien, there is no practical way for the plaintiff and intervenors to collect their debt.

judicially in the 19th century. Gilmore and Black, The Law of Admiralty, p. 484. It afforded a device whereby those who supplied services and supplies of various kinds to vessels might obtain security for the debts due them. Gilmore and Black, *supra*, § 9–19, pp. 510–519.

As the lien was formed and molded by the jurisprudence, problems arose in a number of areas: these included the question of the kind of services or supplies that would be assured lien protection, which is not an issue here, and what parties had the authority to order those services. Except for the early question whether the supplies or services were furnished on the owner's credit or the credit of the vessel, there were relatively few problems when the owner himself or the master whom he had placed in charge of the vessel ordered the services or supplies. However one of the functions of the lien was to provide security in at least some instances where there was no personal liability on the owner's part. Gilmore and Black, *supra*, pp. 488–507.

The early history of the lien has been traced elsewhere. Hebert, The Origin and Nature of Maritime Liens, 4 Tul.L. Rev. 381 (1930). In 1910, the Federal Maritime Lien Act was adopted. Although it does not deal comprehensively with all maritime liens, it does set the course to be followed with respect to furnishers of repairs, supplies and other necessaries. (Engines are clearly necessaries, hence governed by the Act.)

Others have examined the history of the Act, and its later modification, and have discussed its scope comprehensively. Gilmore and Black, *supra*, pp. 537–568. Smith, The New Federal Statute Relating to Liens on Vessels, 24 Harv. L.Rev. 182 (1910). Insofar as the present problem is concerned, the Act sets clear criteria for determination. Repairs and necessaries furnished on the order of a charterer create a lien unless "the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party . . . . the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor." 46 U.S.C. § 973.

While the Act made a number of changes in the law applicable to maritime liens, Griffin, The Federal Maritime Lien Act, 1924, 37 Harv.L.Rev. 15, the changes were limited in scope. 1 Benedict on Admiralty § 88, p. 272. The provision quoted above is "merely declaratory of the general maritime law, as set forth in numerous cases decided before the statute,—notably in The Kate [1896, 164 U.S. 458 (17 S.Ct. 135, 41 L. Ed. 512)] and The Valencia [1897, 165 U.S. 264 (17 S.Ct. 323, 41 L.Ed. 710)]." The Federal Maritime Lien Act, *supra* at p. 33.

After the statute was enacted, differences in interpretation of the duty of the furnisher to inquire were put at rest by the decision in United States v. Carver, 1923, 260 U.S. 482, 43 S.Ct. 181, 67 L.Ed. 361. The Court there said in words applicable here:

"We regard these words as too plain for argument. They do not allow the materialman to rest upon presumptions until he is put upon inquiry, they call upon him to inquire. To ascertain is to find out by investigation. If by investigation with reasonable diligence the material man (sic) could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms he was chargeable with notice of its terms. In this case it would seem that there would have been no difficulty in finding out both." 260 U.S. at 489, 43 S.Ct. at 182.

See also, Tampa Ship Repair and Dry Dock Co. v. Esso Export Corp., 5 Cir. 1956, 237 F.2d 506; American Marine Corp. v. Towboat Z-Fourteen, W.D.La. 1961, 214 F.Supp. 849.

■■ But the supplier who furnishes to the actual owner has a lien whether or not he makes inquiry, because the owner in all cases has authority to bind

800

his own vessel. The Bergen, 9 Cir.1933, 64 F.2d 877. Hence the initial quasi-nosological issue is whether Poirier was owner or charterer of the vessel. The classification problem becomes complex because, historically, charters are maritime contracts, interpreted by admiralty courts, Morewood v. Enequist, 1860, 64 U.S. (23 How.) 491, 16 L.Ed. 516; see 1 Benedict on Admiralty § 66, and cases cited therein, while contracts for the sale of a vessel have been held non-maritime. The Ada, 2nd Cir.1918, 250 F. 194; Grand Banks Fishing Co. v. Styron, D.Me.1953, 114 F.Supp. 1. Generally, whether or not an agreement passes title to a vessel is to be determined by state law. See First National Bank & Trust Co. of Vicksburg, Miss. v. The Seneca, E.D.La.1960, 179 F.Supp. 847.

Is the agreement between Poirier and Leda, construed as a charter, effective to preclude the imposition of liens? That it is sufficient under the Maritime Lien Act, 46 U.S.C. § 971 et seq. to bar imposition of liens by a charterer there can be no doubt: the charter specifically forbids the imposition of liens and requires notice to that effect to be given. Paragraph 10c of the agreement requires the Charterer to "post under clear glass or plastic at a noticeable place in the pilothouse of the towboat" and to show "to all persons making inquiry as to their right, or absence of right, to encumber the vessel, notice in substantially the following form . . .

THIS VESSEL IS SUBJECT TO BAREBOAT CHARTER BETWEEN LEDA TOWING CO., INC. AND TRIPLE D. TOWING, INC., AND JOSEPH POIRIER, AND ALL IMPOSITIONS OF LIENS ON THE VESSEL, WHETHER OR NOT INCURRED BY THE MASTER OR OTHER PERSON REFERRED TO BY TITLE 46, UNITED STATES CODE, SECTION 971 ff., IS [sic] PROHIBITED BY THAT CHARTER."

■ Though it is disputed, a preponderance of the credible evidence supports the conclusion that a document containing this prohibition was in fact posted. Thus Kane was put on notice of its provisions. A lien, therefore, could not arise against the vessel under the provisions of the Federal Maritime Lien Act.

When the possessor of a vessel exercises possession under a conditional sale agreement rather than a charter, admiralty courts have applied the same rule as to the duty of the furnisher to make inquiry. In the Oceana, 2 Cir.1917, 244 F. 80, a conditional vendee was allowed to take possession of the vessel and fit her out. Some furnishers of supplies were held to have valid liens against the vessel, in spite of a prohibition against liens clause in the agreement of sale. However, the court pointed out in dicta that a lien may not be created by a conditional vendee "who has no authority to bind the vessel, provided the repair and supply men knew, or ought with reasonable diligence to have learned, that the charter or conditional agreement of sale deprived the charterer or vendee of this authority." 244 F. at 82–83. The result thus suggested has in fact been the holding in subsequent cases. Deibert Barge-Bldg. Co. v. United States, 4 Cir. 1923, 289 F. 805; The Henry S. Grove, W.D.Wash.1923, 287 F. 247; Standard Oil Co. v. United States, 4 Cir.1924, 1 F.2d 961; Frey & Son, Inc. v. United States, 4 Cir.1924, 1 F.2d 963; John Baizley Iron Works v. United States, E. D.Pa.1925, 6 F.2d 25.

But where the conditional sale agreement providing against liens was not recorded and the conditional vendee, whose name was on the vessel and who was in possession, asserted ownership, the supplier who made inquiry without ascertaining the true facts was permitted to assert liens. The Hurricane, E. D.Pa.1925, 2 F.2d 70. See also The Bethlehem, 3 Cir.1925, 4 F.2d 308 (lien implied when reasonable inquiry would have been futile).

■ Hence there would be no lien if the events here had occurred in any State other than Louisiana. For, wheth-

er the agreement between Leda and Poirier is regarded as a charter with an option to purchase or as a conditional sale, Poirier would not be the owner and, as charterer or conditional vendee, he would not have authority to bind the vessel. Kane had notice of this and, therefore, cannot assert a maritime lien against the vessel.

But under Louisiana law a conditional sale, despite its terms, is effective to pass title, Barber Asphalt Paving Co. v. St. Louis Cypress Co., 1908, 121 La. 152, 46 So. 193, and since the agreement perfected in Louisiana between Leda and Poirier would likely be construed by state courts as a conditional sale, it is argued that a different result should be reached in this case; the conditional sale to Poirier should be treated as a sale in fact vesting Poirier, as the new owner, with authority to bind the vessel.

The course is an attractive one if the helmsman chooses merely to follow conventional logic: the transaction is non-maritime; therefore it is governed by state law; therefore, ownership passed. But the function and purposes of the maritime lien law forbid this easy passage. For one of the implicit purposes of the Maritime Lien Act was to impart uniformity to the rules applicable to the furnishing of repairs and necessaries. Hence a unique principle of Louisiana law should not be applied to this clearly maritime transaction. In a suit between parties to a lease-purchase contract executed in Louisiana, similar in many ways to the one here, the Fifth Circuit Court of Appeals recently applied the rules generally followed in maritime law rather than Louisiana doctrine. Jack Neilson, Inc. v. TUG PEGGY, 5 Cir. 1970, 428 F.2d 54.

To apply Louisiana law in construing the agreement between Leda and Poirier would defeat the apparent intention of the parties. But, more important, it would contravene the constitutional mandate for uniformity in admiralty matters. The consequences of a conditional sale, clearly maritime in nature, should not differ in Louisiana from its consequences elsewhere, at least with regard to the rights of furnishers of repairs and necessaries, which are clearly regulated by the federal Act.

For these reasons, the court finds that Leda remained the owner of the LEDA with power to deny Poirier the right to bind the vessel. Hence, no lien exists against the vessel.

## IV. UNJUST ENRICHMENT

Finally, it is asserted that the suppliers are entitled to judgment for the amount by which the defendants were unjustly enriched. Admiralty will entertain a claim for unjust enrichment, or, as it is sometimes called, quasi contract. Archawski v. Hanioti, 1956, 350 U.S. 532, 76 S.Ct. 617, 100 L.Ed. 676; Sword Line Inc. v. United States, 2 Cir. 1956, 230 F.2d 75; Hadjipateras v. Pacifica S.A., 5 Cir.1961, 290 F.2d 697. See also Chandler, Quasi Contractual Relief in Admiralty, 1923, 27 Michigan L.Rev. 23. This claim does not however give rise to a lien. It is purely in personam.

The owners of the LEDA, Leda Towing and, subsequently, Leon and David Vial, clearly benefited from the installation of the engines in the vessel. Kane is entitled to recover the benefit he bestowed under a quasi-contract theory. But since it has not been shown that any tortious conduct on the owners' part caused them to receive the benefit, the measure of recovery is the value of what was received. See Restatement of the Law of Restitution, Section 155. This amount is not necessarily equal to the cost of the repairs. Because no evidence was presented as to the value of the engines to the owners, the court can make no award.

## AFTER SECOND HEARING

At a second hearing held in this matter to consider the claim for unjust enrichment, the following facts were developed: In November, 1969, both the

Waukesha and the GM engines on the LEDA were replaced with a new GM V–12 and a rebuilt GM V–12. The total cost of the major components of the engines was $23,283.92. Additional parts were supplied through other suppliers, at a total cost of $1,381.66. The bill for installation costs was $4,200. Thus the total bill was $28,865.58; the work was completed in early December, 1969.

As the original opinion indicates, the LEDA was under a lease-purchase type charter to Poirier at the time. The lease-purchase agreement was predicated on a price of $85,000, with interest at 8%. Thus the monthly payment was $2200 for a period of 60 months. A deposit of $3000 was made, to be applied to the price. On April 17, 1970, after Poirier was in default in his payments, the vessel was seized at the instance of plaintiff. Thereafter the charter was terminated, and somewhat later the vessel was released from seizure. Leda Towing Company, Inc. resumed control of the vessel. The vessel was then laid up for a period of time. The record does not indicate whether it was operated at all until August 1971. However, Leda owed many debts, including $51,000 to the Bank of St. Charles and Trust Company, Luling, La., on a note secured by a mortgage on the M/V LEDA, and, endorsed by Leon C. Vial III and David Vial, and $91,325 to Fashion Land Company. On August 20, 1970, Leda Towing Company, Inc. conveyed the M/V LEDA to the two Vials in consideration of their assumption of these debts.

Thereafter, on October 14, 1970, the Vials agreed to a lease-purchase charter party for the M/V LEDA with Gnots, Inc. and Forsee Estes, for a payment of $1,800 per month over a period of 57 months, secured by a deposit of $2500. The agreement was later reduced to writing and signed on January 15, 1971. This charter party was based on a valuation of the vessel of $80,000. But it was soon terminated. On February 24, 1971, the vessel was chartered to Admiral Towing Company on a similar lease purchase agreement stipulating monthly payments of $1800 per month for 60 months, based on a purchase price of $85,000 for the vessel, with a deposit of $5000.

The theory of the plaintiff is simple: If the LEDA had worn out engines (the equivalent of no engines), no one would buy the vessel except on the basis of computing the value of the vessel with good engines and deducting the cost of installing functioning engines. Therefore, the repairs enhanced the value of the vessel, and the measure of the improvement was the value of the repairs. There was testimony fixing this value at $24,000—something less than the total actual charge of $28,865.58 because it would be necessary to deduct the salvage value of the old engines.

But even if this theory concerning the value of the repairs to the vessel itself be accepted as correct, this enhancement occurred when the repairs were completed in December, 1969. Thereafter, the engines underwent heavy wear. At this time, nothing was done with respect to the pitch of the propellers. In November, 1970, when the Vials were operating under the trade name Mary Alice Towing Company and were negotiating their lease-charter with Gnots, Inc., it was discovered that the engines were not functioning properly because the pitch of the propeller had not been adapted to the GMC engines. (We need not pause to determine whether it was the responsibility of the plaintiff to call to the owner's attention the possibility that, when "new" engines were installed, other adjustments might be required.)

The pitch of the propellers was altered on November 7, 1970, from 52″ to 54″ x 38″. The propellers were reconditioned, and the total cost of the jobs (excluding repair of fractures in the vessel's stern) was $1108. The operation of the vessel in the meanwhile had caused excessive wear on the engines because they had been operating inefficiently. Thus, the net "enrichment" as a result of the installation of the new

vessels was substantially diminished by the time Leda acquired the vessel free of the charter party in April, 1970.

There is no evidence whatever concerning the value of the vessel in August, 1970, when the Vials personally took it over. Of course, they were liable to the bank on the note. But the extent to which they were benefitted by the repairs on the vessel cannot exceed the value of those repairs to them at that time. Presumably this would be measured by the difference in the net value of the vessel at that moment between (a) its value with the original Waukesha and GMC engines and (b) its value at that moment with the replacement engines in the condition they were at that time. No evidence of this was presented.

Even if it be assumed that a depreciation schedule of some kind could be computed, by which the value of the vessel could be projected, any schedule would assume normal wear on the vessel and its engines, not excessive wear and operation with improper propellers. Hence the record is devoid of evidence concerning the value of what the Vials received. See Restatement of the Law of Restitution, Section 155.

Finally, there was some evidence that the engine stands were not properly installed and that it would cost $8000 to rebuild the vessel so as to do it properly. The engines do not seem to have been properly installed, the engine mounts do not seem adequate and the vessel has excessive vibration. There was no evidence of this at the time of the initial hearing, but these facts do of course reduce the benefit obtained by the repair.

It is unnecessary therefore to consider whether the Vials were unjustly enriched at the plaintiff's expense. See La.Civil Code Article 1965. However in passing it may be noted that they do not appear to have themselves engaged in any wrongful conduct. They took over the vessel, and assumed the obligation to the bank, as, indeed, they were already bound to do, in the condition it was in at the moment. They are not shown to have misrepresented the state of affairs to the plaintiff or to the intervenor, or to have misused their positions as stockholders and corporate officers. Finally, it may be noted that they wound up with a charter party no more advantageous than the one to Poirier had been.

The doctrine of unjust—or, as it is sometimes called, unjustified—enrichment is not a synonym for a type of "palm tree justice" by which every unjust displacement of wealth from one person to another can be remedied. Nicholas, Unjustified Enrichment in the Civil Law and Louisiana Law, 1962, 36 Tulane L.Rev. 605, 607. "The requisites of the enrichment action are thus often expressed under the five headings of (i) enrichment, (ii) impoverishment, (iii) a connection between the enrichment and impoverishment, (iv) absence of justification or cause, (v) "subsidiary character of the remedy." Id. at 610.

The denial of recovery in the subsidiary action *de in rem verso* is illustrated by Nicholas in a hypothec similar to the facts here:

In the preceding pages we have examined the operation of the principles of cause and directness in a number of situations involving third parties. We may now summarize these situations under four headings.

(1) *There has been a juridical act (usually a contract)* both between I and T and between T and E, *e.g.*, if T, being contractually bound to have E's automobile repaired, has engaged I to carry out the repairs, but is now insolvent. Into this category fall the cases of the sharecropping tenant, the loan by the bank, and the tramway concession. Neither French law nor German law allows I to claim from E, though for different reasons. German law denies I's action either because the transfer of value from him to E was indirect or, even if it was direct, because it was made to discharge a duty owed by I to T and therefore had a cause. French law denies I's claim because the transfer finds its justification either in the discharge of a duty owed by T to E or in the terms

of the contract (or other act) between them. Id. at 632.

Here the plaintiff had his remedy against Poirier in contract. He sues defendants only because Poirier is insolvent. If he had a lien, he might still recover on the lien. Having none, he invokes "unjust enrichment"—without any attempt to analyze the doctrine or its application here. If the remedy were available here, it would defeat the rule that denies the plaintiff a lien and permit him to follow the vessel into the Vials' hands. Se Nicholas, supra at 639.

A similar view is adopted by the Restatement. Thus Comment c to Section 1, Restatement of the Law of Restitution, states:

> Even where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it. The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor. Thus, one who improves his own land ordinarily benefits his neighbors to some extent, and one who makes a gift or voluntarily pays money which he knows he does not owe confers a benefit; in neither case is he entitled to restitution.

 At common law, one who adds value to the chattels or land of another is not thereby entitled ipso facto to their increased value. Restatement, § 42. And in Louisiana, the action de in rem verso has been seldom used. Note (1968) 14 Loyola L.Rev. 434, 442. The action is not founded on Civil Code Article 2294, which defines quasi contractual obligations, but on Articles 21 and 1965. Note (1968) 14 Loyola L.Rev. at 444–445. As the author of that Note states,

> Whenever plaintiffs have invoked these articles, the Louisiana courts have been careful to see whether there has been an existing law which would prohibit the court from deciding the issue on purely "equitable" principles,

In Clark v. Shaffet, a plumber basing his claim on unjust enrichment and Articles 21 and 1965, sought judgment against defendant homeowner who was enriched by his work; but the court denied recovery because (1) plaintiff had not entered into his contract with defendant, but rather with defendant's father, (2) and at a time when defendant did not own the house, (3) and further, plaintiff failed to record his builder's and materialman's lien. In Moore v. Housing Authority of Opelousas, a subcontractor sought under Articles 21 and 1965 to recover quantum meruit for the work he had performed. The court rejected his plea noting that there was no privity of contract between plaintiff and defendant; and that since plaintiff had entered into a contract with the contractor to be paid on whatever basis the contractor would be paid, plaintiff had a legal remedy against the contractor which barred application of Articles 21 and 1965. 14 Loyola L.Rev. at 445.

While we here apply admiralty principles, these analogies, drawn from civil and common law are instructive. There has been no "unjustified enrichment" of the Vials.

 As to Leon and David Vial, therefore, there is no basis for concluding that they were unjustly enriched or, if so, in what amount.

 With respect to Leda Towing Company, Inc. the plaintiff continues to pursue its claim despite the recital that the company is "substantially insolvent." For whatever academic value it may have, therefore, findings with respect to it are made. Leda Towing Company, Inc. did have the duty to bear the cost of repair of engines, gear and equipment necessary or proper upon delivery of the vessel. While Poirier made no demand for such repairs, his ordering of the repairs and the resulting improvement in the vessel's value appear sufficient to warrant a finding that it was unjustly enriched thereby. The ex-

tent of its enrichment is determined as follows: plaintiff's testimony established $24,000 as the value of the repairs; from this deduct $4000 as ½ the cost of correcting deficient items.