The PENINSULAR & ORIENTAL
STEAM NAVIGATION
COMPANY, Plaintiff,

v.

OVERSEAS OIL CARRIERS,
INC., Defendant.

No. 74 Civ. 1854 (GLG).

United States District Court,
S. D. New York.

Aug. 20, 1976.

Burlingham, Underwood & Lord, New York City, for plaintiff; by William M. Kimball, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant; by David P. H. Watson, New York City, of counsel.

OPINION [1]

GOETTEL, District Judge.

The sea is a hard master and those who sail her are united in a common struggle. It is their tradition to answer calls of distress regardless of cost or peril. So firmly accepted is this tradition that our laws

1. The parties previously cross-moved for summary judgment on an agreed statement of facts. The Court (U.S.D.J. Pierce) denied the motions finding that there were material issues

make it a criminal offense to ignore those "at sea in danger of being lost."[2] This case raises the interesting (and somewhat novel) question of whether those who go to the aid of seamen in distress are entitled to have their expenses reimbursed.

On July 4, 1973, William Turpin, a 63 year old fireman aboard the S.T. OVERSEAS PROGRESS, a tanker owned by the defendant (a New York corporation), began experiencing severe chest pains suggestive of a heart attack. The ship had no doctor, nurse or operating room. Turpin was treated by the ship's officers, who were guided by medical books and radio advice from the U.S. Public Health Service.

On July 5, Tuprin suffered a further attack. His condition was considered grave. The maximum speed of the OVERSEAS PROGRESS was 13.8 knots; it would have taken the OVERSEAS PROGRESS 57 hours to reach the nearest shore hospital, approximately 740 miles away. The master of the OVERSEAS PROGRESS sent a radio request to all ships in the vicinity with a doctor. The S.S. CANBERRA, a passenger vessel owned by plaintiff (a British company), was the closest vessel with medical facilities at that time. The two ships agreed to meet. Both altered course, the OVERSEAS PROGRESS maintaining its maximum speed, the CANBERRA increasing its speed from 23 to 25 knots. The ships rendezvoused approximately six and one-quarter hours later.

The CANBERRA took Turpin aboard and had him hospitalized, examined, tested and treated by the ship's surgeon and assistant surgeon. He was cared for by the ship's nurses and was given medication and nourishment. After taking Turpin aboard, the CANBERRA continued at its increased speed to New York, arriving on July 8,

1973, about two and one-half hours áfter her scheduled arrival time, having travelled 232 extra miles because of the request for assistance by the OVERSEAS PROGRESS. Turpin was transferred to a Public Health Service hospital for further treatment; he survived the attack.

In August, 1973, defendant received a bill from plaintiff's New York landing agent for $248 for services rendered by the CANBERRA's surgeon; the defendant paid that bill. On September 26, 1973, plaintiff billed the defendant's agent for CANBERRA's diversion costs, other medical and out-of-pocket expenses totalling $12,108.95. Defendant declined to pay. This action was then commenced.

■ Once it became apparent that Turpin's illness was serious the defendant became obligated to make reasonable efforts to provide him with medical care. *See The Iroquois,* 194 U.S. 240, 243, 24 S.Ct. 640, 48 L.Ed. 955 (1904); G. Gilmore & C. Black, *The Law of Admiralty,* 2d ed., § 6–13 at 310. The question is whether the defendant, by entrusting Turpin to plaintiff's care, became liable for the CANBERRA's diversion costs and out-of-pocket expenses.

The arguments of the parties raise two issues: 1) whether the action is, in essence, an attempt at remuneration for "pure life salvage" and 2) whether there can be a recovery based on contract (quantum meruit or unjust enrichment).

■ Defendant contends that plaintiff is actually seeking an award for life salvage and that it is hornbook law that pure life salvage, *per se,* is insufficient to allow a recovery. As *The Law of Admiralty, supra,* states, § 8–1 at 532:

"Historically, the saving of life was regarded as fulfilling a moral duty but not

of fact in dispute. Thereafter (following reassignment of the case) the parties submitted an additional agreed fact statement and stipulated that the case was submitted for trial and decision on the agreed facts.

**2.** Title 46 U.S.C. § 728 provides:
"The master or person in charge of a vessel shall, so far as he can do so without serious

danger to his own vessel, crew, or passengers, render assistance to every person who is found at sea in danger of being lost; and if he fails to do so, he shall, upon conviction, be liable to a penalty of not exceeding $1,000 or imprisonment for a term not exceeding two years, or both."

as entitling the salvor to a reward. Thus there was a natural temptation to save property first and look around for survivors later. Life salvors now have by statute a right to a 'fair share' of the award made to salvors who have saved property on the same occasions.[3] Life salvage, unaccompanied by property salvage, still goes unrewarded."

Plaintiff counters that this is not pure life salvage since it saved the defendant considerable expense. This saving of expense, in and of itself, is sufficient to constitute a form of "salvage," argues plaintiff. See Brown, *Compensation For Life Salvage at Sea*, 2 Hastings L.J. 53, 55 (1951). In addition, plaintiff contends that life salvage principles are inapplicable here as it is seeking only reimbursement for expenses and not a salvage award.

The law of the sea has clearly not allowed an award solely for life salvage. In order to recover for life salvage, there must be property salvaged, *St. Paul Marine Transp. v. Cerro Sales Corp.*, 313 F.Supp. 377 (D.Hawaii 1970), and it must occur "substantially at the time and while both lives and property were in distress . . . " *The Eastland*, 262 F. 535, 541 (N.D.Ill.1919). American cases do not support the proposition that one who saves life at sea, disassociated from any salvage of property, is entitled to an award.

Here plaintiff maintains that it is asking only for reimbursement of expenses, not an award. This distinction has not been recognized by the courts. In fact, Professor Brown, in his article, *supra*, admits that such an extension of the principle of salvage, while desirable, was not then (1951) embodied in our law. *See*, 2 Hastings L.J. at 54. This situation, while not the classic rescue at sea, does resemble life salvage, as it is possible that Turpin would not have survived a 57-hour trip to the nearest shore hospital.

The courts have been reluctant to assess maritime liens against vessels because of services to its passengers and crew. The explanation for this is that there is a moral duty to aid those in danger at sea and that it would be an undue burden on the ship owner whose property and personal interests had not been served. Brown, *Compensation for Life Salvage at Sea, supra* at 55.

The contract claim constitutes the crux of plaintiff's case. The complaint sounds in unjust enrichment and, in its memorandum, plaintiff cites a line of cases where a defendant was held liable for a plaintiff's services under a quantum meruit theory. *See, e. g., Rathbun v. Halvorson*, 181 F.2d 57 (5th Cir. 1950); *Kane v. M/V Leda*, 355 F.Supp. 796 (E.D.La.1972), aff'd, 491 F.2d 899 (5th Cir. 1974); *Murray v. The Meteor*, 93 F.Supp. 274 (E.D.N.Y.1950). On the other hand, defendant argues that the essential elements of an intention to pay and an implied promise to pay are lacking here; consequently plaintiff cannot prevail on this theory.

■ Admiralty has no power to enforce an independent equitable claim. *The Eclipse*, 135 U.S. 599, 608, 10 S.Ct. 873, 34 L.Ed. 269 (1890). However, admiralty does have jurisdiction over causes of action based on the concept of unjust enrichment as long as the claim arises out of a maritime contract. *Archawski v. Hanioti*, 350 U.S. 532, 535, 76 S.Ct. 617, 100 L.Ed. 676 (1956). Here there was no written contract between the parties. Consequently, plaintiff must establish its claim either via quasi-contract (a contract implied in law) or quantum meruit (a contract implied in fact). *Miller v. Schloss*, 218 N.Y. 400, 406–07, 113 N.E. 337, 339 (1916) distinguishes the two types of implied contracts:

"A contract cannot be implied *in fact* where the facts are inconsistent with its existence; or against the declaration of the party to be charged; . . . The assent of the person to be charged is

---

**3.** Title 46 U.S.C. § 729 provides:

"Salvors of human life, who have taken part in the services rendered on the occasion of the accident giving rise to salvage, are entitled to a

fair share of the remuneration awarded to the salvors of the vessel, her cargo, and accessories."

necessary and unless he has conducted himself in such a manner that his assent may fairly be inferred he has not contracted.

\* \* \* \* \* \*

A quasi or constructive contract rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. . . It is an obligation which the law creates . . . ."

At the time the arrangements were made for the rendezvous, the masters of the vessels had a radio-telephone conversation in which the Master of the S.S. CANBERRA advised the Master of the OVERSEAS PROGRESS that plaintiff might look to defendant for reimbursement. This was confirmed by a letter dated July 5, 1973 from the Master of the CANBERRA to the Captain of the OVERSEAS PROGRESS which stated:

> "I trust you understood my remarks on the R.T. when I came to your assistance. I have to inform you that you should inform your owners that my company, P & O Steam Navigation Company, may look to them for reimbursement of diversion costs, medical and out-of-pocket expenses. Would you please sign a copy of this letter to indicate your understanding and receipt of this information."

The parties have agreed in their additional agreed fact statement ( # 29) that the radio conversation and the letter did not constitute a demand for reimbursement, nor an agreement to make one; rather:

> " . . . . Both masters simply left open for subsequent determination by their respective employers, plaintiff and defendant, whether plaintiff would demand reimbursement and, if so, whether defendant would make reimbursement."

In subsequent correspondence the owners of the CANBERRA made a claim for reimbursement of expenses and the defendants refused to pay. With respect to the claim for quantum meruit, no case has been found by the Court, or cited by the parties, which applies quantum meruit to the saving of life at sea. All of the cases cited by plaintiff deal with property salvage. Where property is involved, a court will imply a contract in fact if the property has been improved; *see Kane v. M/V Leda, supra,* 355 F.Supp. at 801.

Plaintiff's final argument looks to the theory of quasi-contract, or unjust enrichment. "The law creates . . . [a quasi-contract] regardless of the intention of the parties, to assure a just and equitable result." *Bradkin v. Leverton,* 26 N.Y.2d 192, 196, 309 N.Y.S.2d 192, 195, 257 N.E.2d 643, 645 (1970). There are certain elements which are part of an action in quasi-contract. One of these elements is misconduct or fault, such as breach of fiduciary duty, on the part of the party sought to be charged. *Shooters Island Shipyard Corp. v. Standard Shipbuilding Corp.,* 293 F. 706 (3d Cir. 1923); *F. E. Grauwiller Transp. Co. v. King,* 131 F.Supp. 630, 634 (E.D.N.Y.1955), *aff'd* 229 F.2d 153 (2d Cir. 1956). In this case, defendant's conduct clearly involved no misconduct, fault or undue advantage. As the above elements are lacking, the plaintiff cannot recover its diversion costs in quasi-contract, notwithstanding the principle that equity is no stranger to admiralty. *See Demsey & Associates, Inc. v. S.S. Sea Star,* 500 F.2d 409, 411 (2d Cir. 1974).

There is, however, one aspect of unjust enrichment present here. Plaintiff claims a total of $12,108.95 in diversion costs. Virtually all of this is for the additional oil used. But a small amount, $500, is for "Accommodation and Nursing", the equivalent of hospitalization costs. Had the defendant's ship been in port it would have been required to pay such expenses for its crew member, unless public facilities were available.[4] Moreover, these costs accrued after the transfer ("rescue") was effected and were part of custodial treatment and

---

4. Public facilities for seamen are provided in the United States by the Public Health Service, 42 U.S.C. § 249.

care. Payment of this expense is not a part of "life salvage."

Considering the absence of controlling authority it appears appropriate to consider the public policy aspects. As a foreign flag vessel operating in international waters, the S.S. CANBERRA was not subject to the criminal sanctions of 46 U.S.C. § 728. It has long been accepted that awards are made after salvage to encourage voluntary assistance since "the whole theory of salvage is predicated upon the proposition that by the general admiralty law there is no legal duty to aid a thing or person who is in distress". S. H. Robinson, *Handbook of Admiralty Law* (1939) at 722. From this standpoint the allowance of an award might be said to encourage assistance. On the other hand, a ship with a stricken crewman might be reluctant to seek aid if large, unforeseen expenses could be assessed against it. The answer would seem to be in appropriately drafted legislation or international compacts imposing sensible limitations. *See Aviation and Salvage: The Application of Salvage Principles to Aircraft*, 36 Colum.L.Rev. 224 (1936) dealing with air crash salvage.

For the present it would appear to be beyond the province of this district court to inaugurate a new policy deviating from the centuries old common law doctrine. *The Life Salver Problem in Admiralty*, 63 Yale L.J. 779, 784 (1954). Except for an award of the $500 nursing and accommodation expense,[5] which defendant would have been obligated to pay to a private hospital, and which was part of custodial care and not rescue, the plaintiff may not recover. Plaintiff is left, however, with the recognition that its efforts were in keeping with the finest traditions of the sea.

Judgment should be entered accordingly, within ten days.

SO ORDERED.

5. Defendant concedes that the hospitalization had a value but is not prepared to concede that its fair market value was $500. It has not, however, submitted any evidence disputing plaintiff's claim. For two days of intensive

care service (plaintiff's ship had an operating room, a surgeon, an assistant surgeon, two nurses and a hospital assistant), the charge does not seem unreasonable.