UNIVERSAL DRILLING CO., INC., Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 73–947.

United States District Court, E. D. Louisiana.

Jan. 29, 1976.

Peter J. Butler, New Orleans, La., for plaintiff.

Gerald J. Gallinghouse, U. S. Atty., New Orleans, La., Howard A. Weinberger, Dallas, Tex., Scott P. Crampton, Washington, D. C., William Guild, Peter J. Grabicki, Dept. of Justice, Dallas, Tex., for defendant.

ALVIN B. RUBIN, District Judge:

This income tax refund suit involves two separate matters. The first relates to whether a transaction involving an offshore drilling barge should have been treated as a sale or a lease; the second involves allocation of the purchase price paid for land and buildings for depreciation purposes. Of necessity, the issues are discussed separately.

## I. THE DRILLING BARGE TRANSACTION

### A.

Universal owned a drilling barge known as the "MR. LOUIE." It had attempted unsuccessfully either to sell or to lease the barge. It had substantial funds invested in an unproductive asset. After considerable negotiations, it executed an agreement with Reading & Bates. Reading & Bates was a wholly owned subsidiary of Reading & Bates Offshore Drilling Company and Reading & Bates, Incorporated. It was created for the purpose of the drilling barge transaction and it had no other assets. While Universal wanted to make a sale to one or both of Reading & Bates' parent companies, the parent companies did not

want to commit themselves to the debt that would have been required to acquire title to the barge, and Reading & Bates Offshore, one of the parent companies, was prohibited by its loan agreements from incurring any further liability. By creating and employing Reading & Bates as a "shell" corporation, the corporate owners would avoid any jeopardy from its financial failure. Since the company had no funds with which either to purchase or pay rental on the drilling barge, it intended to keep the agreement in effect only if the barge could be used to produce enough money to meet the scheduled payments. Universal was aware that the lessee was to be a shell corporation, and was concerned over that fact but accepted this as the best available transaction.

The agreement between Universal and Reading & Bates was called a charter party; Universal was called "lessor," Reading & Bates "lessee." The charter party was for a term of seventy-two (72) calendar months commencing from the date of delivery of the drilling barge to a specified location, at a monthly rental of $67,565.

The monthly payment was to be reduced to $20,000 for any calendar month during which the barge was inactive; there was also to be a proportionate reduction in payments during months in which the drilling barge was partially inactive. In addition, pursuant to a letter agreement executed between Universal and Reading & Bates on October 17, 1959, Reading & Bates was to pay certain sums of money each month to a "savings fund," until that fund reached a total of $750,000. Universal was given the right to withdraw $20,000 per month from the fund during those months in which the drilling barge was inactive (or a proportionate amount during those months in which the drilling barge was partially inactive).

The purpose of this fund is not clear. However, since Reading & Bates had no other assets, it would have no resources to meet payments when the barge was idle if it dissipated funds earned while the barge was employed. The preponderance of the evidence indicates that the fund was intended primarily to provide funds for the payments during periods when the barge was inactive, and to build up a reserve to secure future performance of the agreement.

The agreement gave Reading & Bates the right to purchase the drilling barge during the term of the lease for the sum of $4,750,000, less the charter hire credits reflected on a schedule that was furnished to the parties, but not attached to the agreement. If Reading & Bates exercised this option at the termination of the lease period, it was to pay to Universal the sum of $750,000, plus any unpaid rent. Of course, by that time, the fund would contain the requisite $750,000.

Notwithstanding the ostensible lease created by the charter party, Reading & Bates treated the transaction as an acquisition of title. It did this on the advice of its accountant, who based his determination solely on accounting principles, with the result that Reading & Bates presented a better financial statement than if this transaction were treated as a lease. If it were acquiring title, it could, and did, show the barge as an asset, with a net equity created by the monthly payments. Since it had no taxable income, loss of a rental deduction for income tax purposes was of no consequence; a deduction could be obtained in any event, by treating the barge as an asset and deducting depreciation.

The lawyer who represented Reading & Bates testified that it was his intention to prepare a true bareboat charter with an option to purchase. The lawyer who represented Universal testified that it was also his intention to prepare a bona fide lease.

The agreement prohibited Reading & Bates from encumbering the drilling barge, but there was no stricture against encumbrance by Universal. In fact Universal mortgaged the barge as security for a debt in 1961.

Reading & Bates had no responsibility to Universal or its underwriters for damages occasioned to the drilling barge regardless of the cause of or reason for the loss. While Reading & Bates incurred the obligation of purchasing hull insurance with ref-

erence to the drilling barge during the term of the lease (with Universal and Reading & Bates being named jointly as insureds), the ultimate risk of loss was placed upon Universal in the event that no proceeds would be forthcoming under the policies insuring the barge except in instances when damage or loss was occasioned to the drilling barge by the active negligence of Reading & Bates.

The value of the barge indicated by the charter party was $4,750,000. This appears to have been a realistic appraisal. Lease payments, if fully and promptly paid, would amount to $4,000,000. The balance, $750,000, is substantial, both in absolute and relative terms.

The economic life of the barge could not be accurately determined in advance. The barge was experimental. Many movable rigs had capsized or had broken apart at about the time that the MR. LOUIE was constructed. The new barge incorporated a structural design that was not previously in use. Indeed many in the industry doubted that the barge would actually work.

For financial reporting purposes, Universal depreciated the barge over a period of six years (the life of the charter party) so as to allow the undepreciated cost at the expiration of the charter party to approximate the purchase price under the option. For income tax purposes, Universal depreciated the barge over an estimated life of 12 years, by the double declining-balance method.

There is evidence that the total monthly payment of $67,565 was composed of two elements, $64,440 plus $4,125. The government asserts that $64,440 represents the monthly principal and interest payment on a $4,000,000 loan to be paid off over 72 months at five percent interest; and that $3,125 represents five percent interest per annum, paid monthly on $750,000. No evidence was offered, however, about the rate of interest that would have been charged by parties dealing at arm's length in 1959 had the transaction been a sale, nor how these figures were in fact reached. Apparently, none of the witnesses were examined about these figures.

On August 28, 1964, Reading & Bates exercised its option to purchase the drilling barge and agreed to pay Universal the sum of $2,150,000. The savings fund had reached its scheduled maximum, $750,000, and this sum was applied to the purchase price.

For both accounting and tax purposes, Universal consistently treated the bareboat charter as a lease and reported the monthly payments received by it from Reading & Bates as rental income. It reported the August, 1964, transaction as a sale.

The government contends that the transaction was not a bareboat charter, but was a sale in 1959 and should have been treated as a sale for tax purposes. Universal paid the tax deficiency assessed and sues to recover it.

### B.

The substance of a transaction controls its tax consequences, notwithstanding the form in which it is arranged or the label placed on it by the parties. *Commissioner of Internal Revenue v. P. G. Lake, Inc.,* 1958, 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743. Thus, where what is called "rental" under an agreement actually pays for the transfer of ownership of the property, and not merely for its use, the law requires that, for tax purposes, the transaction be treated as a sale rather than a "lease." *M & W Gear Co. v. Commissioner of Internal Revenue,* 7th Cir. 1971, 446 F.2d 841; *Oesterreich v. Commissioner of Internal Revenue,* 9th Cir. 1955, 226 F.2d 798. See also *Estate of Hedrick v. Commissioner of Internal Revenue,* 9th Cir. 1969, 406 F.2d 587, which traces the entire history of the *Oesterreich* litigation.

It is not always easy to determine the substance of a transaction, and there is no tax spectroscope that will enable us to examine the essence of a commercial deal negotiated between businessmen with differing interests. All of the various aspects of the arrangement must be examined to form a judgment of its true nature. The ultimate inquiry is an effort to divine the

true intention of the parties, no matter how it may have been plated by words. See *Oesterreich,* supra, at p. 801; *Benton v. Commissioner of Internal Revenue,* 5 Cir. 1952, 197 F.2d 745. The analysis focuses on whether the parties intended merely to negotiate for the use of property or for transfer of its ownership.

▉▉ The test is not "what the parties call the transaction nor even what they may mistakenly believe to be" its name. The criterion is what the parties intend to be the legal effect of the transaction; it should be examined on the basis of what they intended to happen. *Oesterreich v. Comm'r. of Internal Revenue,* 9th Cir. 1955, 226 F.2d 798, 801. In this inquiry it is necessary to examine the economic nature of the payments. Rental is a payment merely for the use of property, and it contemplates return of the rented property at the termination of the lease. On the other hand, if payments, though denominated rental, are required to be made in amounts that actually cover the full economic value of the property, and ownership will ultimately be transferred, they are a payment for ownership.

▉ Thus, we look to whether the user of the property is in fact acquiring an economic equity in the property by virtue of the payments. If the property will be worth substantially more than the price to be paid upon exercise of the so-called option to purchase, then the user will have been building up a true economic interest in the property. See *Oesterreich v. Comm'r. of Internal Revenue,* supra, at 802–803, *M & W Gear Company v. C. I. R.,* supra, at 805.

In a Revenue Ruling, Rev.Rul. 55–540, 1955—2 CB 39, the Internal Revenue Service focused on guides for the tax treatment of equipment transactions labelled as leases. These regulations state (section 4) that the issue "depends upon the intent of the parties as evidenced by the provisions of the agreement, read in the light of the facts and circumstances *existing at the time the agreement was executed.*" (Emphasis supplied.) Factors indicating that a transaction is a sale rather than a lease, "in the

absence of compelling persuasive factors of contrary implication" are one or more of the following:

1. Portions of the period payments are made specifically applicable to an equity to be acquired by the lessee.

2. The lessee will acquire title upon the payment of a stated amount of "rentals" which under the contract he is required to make.

3. The total amount which the lessee is required to pay for a relatively short period of use constitutes an inordinately large proportion of the total sum required to be paid to secure the transfer of the title.

4. The agreed "rental" payments materially exceed the current fair rental value. This may be indicative that the payments include an element other than compensation for the use of property.

5. The property may be acquired under a purchase option at a price which is nominal in relation to the value of the property at the time when the option may be exercised, as determined at .the time of entering into the original agreement, or which is a relatively small amount when compared with the total payments which are required to be made.

6. Some portion of the periodic payments is specifically designated as interest or is otherwise readily recognizable as the equivalent of interest.

These guidelines are consistent with the jurisprudence. But the cases cited by counsel contain dicta that is sought to be applied here without full regard for the issues actually before the court in each case. Therefore, some review of them is desirable. In *Oesterreich,* supra, the agreement related to the use of land for a term of almost 68 years. The total amount to be paid was over $679,000. There was an option to purchase for $10. In distinguishing prior decisions, the court said:

In each of these cases it was always questionable whether or not the options would be exercised. Here there is virtually no question of this, for not only will

Wilshire Holding Corporation acquire valuable land for a mere $10 but it will forfeit a $350,000 building now on the premises to the lessor if it does not decide to pay the $10 and take title. The testimony clearly shows that the Wilshire Holding Corporation during all of the original negotiations was very much concerned with what would happen to its building and the land after the lease expired and would not have agreed to the "lease" unless it provided that title would vest in Wilshire.

Another factor leading to the conclusion that the parties at the time of the transaction intended a sale is that the schedule of payments under the so-called lease was not commensurate to the benefit derived by Wilshire from the occupancy and use of the land, for instead of rising toward the end of the lease as the land on Wilshire Boulevard became more valuable the payments decreased. 226 F.2d at 803.

*M & W Gear v. Commissioner,* 7th Cir. 1971, 446 F.2d 841, also dealt with a so-called lease of land with option to purchase. The lessees intended from the beginning to buy the land. The rental payments were in fact applied to the purchase price by making the nominal option price less than the true purchase price contemplated. There was evidence that the fair market value of the property was at least twice as much as the total option price. In addition the court found that the taxpayer had an economic obligation to buy the property by virtue of its expenditures in it. Hence the payments were for purchase of the property, not rent.

In both of these cases, the true intent of both parties was to transfer title. Whatever the cast of the transaction the nominal lessee was in economic fact found to exercise the so-called option. The option price was either nominal or far less than the predictable value of the property.

The Seventh Circuit considered the identification problem in *Breece Veneer and Panel Company v. Commissioner of Internal Revenue,* 7th Cir. 1956, 232 F.2d 319, which involved a so-called lease and option to purchase a plant and its machinery and equipment. The lease was for five years, but could be extended to eight. The total payments to be made in eight years amounted to $160,000 and there was an option to purchase the property at that time for $25,000. If the lease ended in five years, the rental would be $100,000, and the purchase price would be $50,000. The lessee was obligated to insure and maintain the property. The Seventh Circuit reversed a Tax Court decision that this was in substance a conditional sales contract. It said:

> In such cases it is clear that the form of the contract and the use of the words "lease" and "rent" are immaterial but the obvious distinction in each case is that the rent paid was substantially equal to the value of the goods and the buyer was bound to pay this amount. In the instant case the taxpayer was neither bound to pay rent substantially equal to the value of the property to obtain a deed, nor was it sure to become the owner. The amount of the rent after five years lacked the substantial sum of $50,000.00 to make the taxpayer the owner. 232 F.2d at 322.

It continued:

> The fact that the option was exercised is not indicative of the intention of the parties. It was immaterial that the property proved to be a bargain to the taxpayer. The R.F.C. probably would not have sold the property for $50,000.00 in 1943 but a large decline in the value could reasonably be expected by 1948. The plant was not modern and the equipment was old. 232 F.2d at 322–323.

It noted, too, that the rental paid was reasonable. Hence the payments were to be considered rental. The economic contrast with *Oesterreich* and *M & W Gear* is evident.

■ At least for property purposes transactions involving land might involve different considerations than transactions involving chattels or movable property. But for tax purposes similar tests have been used. Thus, only machinery, not real estate, was involved in *Kitchin v. Commissioner of In-*

*ternal Revenue,* 4th Cir. 1965, 353 F.2d 13. There the contract covered the use of machines for a construction project that was to be completed within 24 months. The lessors had placed the payments in a suspense account to be held until the option was lapsed or exercised. The periodic payments represented a fair return for the use of the equipment; however, the leases contained an option to purchase with a provision that rental would be applied to the purchase price if the option was exercised. The court noted that the short term of the contract resulted in at most a delay to the third year in recognizing income to the lessors. After holding that the payments must be characterized when received, the court held that they were ordinary income, that is to be treated as rental, despite the fact that they were to be applied in toto to the eventual price. The transaction was thus treated as a lease.

By the criteria used in the Revenue Rulings and the cases, the transaction negotiated by Universal and Reading & Bates, and the document prepared to reflect it, was an amalgam. It cannot be said that, in economic reality, the rental clauses merely plated the metal of a sale, or that the transaction assayed as a lease all the way through.

Both parties wanted, for different reasons, to have a document they could call a lease. Neither appears initially to have had tax manipulation in mind.

▮▮▮▮▮ Some indication that the intention was not to transfer title is reflected by the fact that the risk of loss was on Universal; Universal could encumber the property. Another significant aspect of the transaction is that Reading & Bates' owners undertook no financial exposure in the transaction and in reality could abandon the drilling rig and the transaction at any time without significant loss. Thus the lessee would *not* acquire title after payment of the rentals it was required to make. If indeed this destitute corporation can be said to have been "required" in economic fact to pay anything, the charter was not for a relatively short period of use, (see para-

graph 3 of the regulations; a contract is a binding obligation to pay in the future only if the party obligated has the resources to meet the payments); the payments did constitute a large proportion of the total sum required to be paid for transfer of title, but the balance, $750,000, was in any event, not negligible. It might be on hand in the savings fund at the end of the term, but there was no assurance in advance that it would be. The agreed charter payments did not materially exceed the current fair rental value of the vessel. The final price was not nominal in relation to the predictable value of the property, as it could be determined at the time of the original agreement.

The difference between this transaction and the nonrecourse mortgage on a sale, or a conditional sales contract for land, to which the government seeks to analogize it, was that the original owner retained the right to encumber the property, and assumed the risk of loss, even though the charter party provided reimbursement to the lessee for a portion of the rental it had paid in the event of loss.

In addition, it should be noted that under admiralty law title to the barge would not have passed to Reading & Bates under the agreement. *Kane v. M/V Leda,* E.D.La. 1972, 355 F.Supp. 796, aff'd, 5th Cir. 1975, 491 F.2d 899. Finally, the property's useful life extended beyond the lease term. The property would not be consumed in use.

Full weight has been given to the indicia that point in another direction, but the evidence, on net balance, appears to me to weigh more in the direction of lease than of sale. Since alloyed verdicts won't assay, it must be treated as a lease. On this issue, the taxpayer is entitled to judgment.

## II. THE REAL ESTATE TRANSACTION

▮▮▮▮▮ On August 31, 1962, Universal purchased the land and buildings situated at the northwest corner of the intersection of Carondelet and Gravier Streets in the City of New Orleans for $825,000. This is known as the Cotton Exchange Building.

On its books Universal allocated the amount paid for the Cotton Exchange as $200,000 for land; $625,000 for building. Accordingly, it computed its depreciation expense with reference to the building on the basis of $625,000. The government contends that the allocation of the acquisition cost paid by Universal should be $357,787 for land; $467,213 for building. Accordingly, it contends that Universal should have based its depreciation expense on a cost of $467,213.

Universal introduced an appraisal report dated February 10, 1975, that valued the land at $211,150 as of August 21, 1962. But it offered no evidence of the value of the improvements. The government introduced an appraisal report that valued the land at $415,200, and the building at $659,303 (cost approach) and $581,543 (income approach) as of September ·1, 1962.

Universal has the burden of proving, by a preponderance of the competent evidence, the correct amount of depreciation that it is due on the Cotton Exchange Building. Its burden is to establish the depreciable amount, as opposed to the lump sum value of land underlying the building, or the value of land and building as a whole. The Treasury Regulations on income tax, § 1.167(a)–5 (26 C.F.R.), state in part:

> *Apportionment of basis.* In the case of the acquisition on or after March 1, 1913, of a combination of depreciable and non-depreciable property for a lump sum, as for example, buildings and land, the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of acquisition bears to the value of the entire property at that time. * ` * *

Treasury Regulations on income tax have the effect of law, as long as they are reasonable, not plainly inconsistent with the statute that authorizes them, and are duly promulgated. *Maryland Casualty Co. v. United States,* 1921, 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297; *Commissioner of Internal Revenue v. South Texas Lumber Co.,* 1947, 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831. The propriety and correctness of Section 1.167(a)–5, *supra,* has been approved in *Aschaffenburg v. United States,* E.D.La. 1974, 381 F.Supp. 510.

The application of the Regulation requires a determination of three elements:

(1) The amount of the "lump sum," or actual purchase price of the land and building;

(2) the amount that is the appraised fair market value of the depreciable property, or building, alone; and

(3) the amount that is the appraised fair market value of the entire property, or land and building together.

The stipulation of the parties in this case has established the first element, the lump sum, as being $825,000. Universal did not introduce any evidence at trial, however, as to either the appraised fair market value of the building alone, or the appraised fair market value of the building and land together. Its only evidence was an appraisal report containing an opinion as to the fair market value of land alone. Plaintiff has thus not presented to the court any evidence from which an application of the governing regulatory formula may be made, and has thus failed as a matter of law to sustain its burden of proof on this issue.

The plaintiff will prepare a proposed form of judgment and submit it to the defendant for approval as to form.