**In re NITE LITE INNS, a California corporation, Debtor.**

**BURKE INVESTORS, a partnership, Plaintiff,**

**v.**

**NITE LITE INNS, a California corporation, J. Mark Grosvenor and Judson R. Grosvenor, Defendants.**

**Bankruptcy Nos. 79–03350–K, C80–0159–M.**

United States Bankruptcy Court, S. D. California.

Sept. 3, 1981.

E. Mac Amos, Jr., Jennings, Engstrand & Henrikson, San Diego, Cal., for plaintiff.

Colin W. Wied, C. Douglas Alford, James P. Hill, Wied, Granby, Alford & Arkin, San Diego, Cal., for defendants.

MEMORANDUM OPINION AFTER TRIAL ON COMPLAINT AND COUNTERCLAIM FOR DECLARATORY RELIEF AND MONEY DAMAGES

JAMES W. MEYERS, Bankruptcy Judge.

I

In this action the Court must decide several questions emanating from an aborted real estate transaction styled as a sale-leaseback. Burke Investors, a California limited partnership ("Burke Investors"), was the "buyer-lessor" in the transaction and the debtor, Nite Lite Inns, a California corporation ("Nite Lite"), was the "seller-lessee".

On December 7, 1979, Nite Lite filed its petition under Chapter 11 of the United States Bankruptcy Code ("Code"). On May 6, 1980, Burke Investors initiated this controversy, by filing a complaint against Nite Lite, and two of its officers, Mr. J. Mark Grosvenor ("Grosvenor") and his father, Mr. Judson R. Grosvenor. The complaint sought declaratory relief, the appointment of a trustee, damages for breach of contract, and relief from the automatic stay imposed by Section 362 of the Code. 11 U.S.C. § 362.[1]

On June 30, 1980, Nite Lite answered the complaint and filed a counterclaim. The counterclaim sought, among other things, declaratory relief and money damages.

After intermittent settlement negotiations had finally broken down, the case was tried before this Court on July 21–23, 1981. By that time, the issues in the case had been narrowed to focus on the nature of the parties purported sale-leaseback, the availability and extent of money damages claimed by each party, and the recovery of a loan commitment fee.

Having now had an opportunity to examine the evidence and arguments in detail, the Court has concluded that the sale-leaseback was not bona fide. It represented merely a "loan", or financing arrangement between the parties. Given this conclusion, Burke Investors is only entitled to a general unsecured claim consisting of reimbursement damages plus interest accrued to the filing date of the petition herein. Nite Lite is not entitled to any offset for damages under its counterclaim, and finally, Burke Investors is not entitled to reimbursement

---

1. Burke Investors' claim for relief from stay was subsequently disposed of in a motion for judgment on the pleadings filed by Nite Lite. The claim for the appointment of a trustee was rendered moot on November 20, 1980, when Mr. Hugh Friedman was appointed to act as trustee for Nite Lite.

of the loan commitment fee it paid. This opinion is filed to set forth the reasoning behind these decisions.

## II

### FACTS

A. *The Negotiations Between the Parties*

Sometime in late 1977 or early 1978, Grosvenor met Mr. Phillip White ("White") a realtor in San Diego, California. Grosvenor desired to construct a "Nite Lite Inns" motel in the Point Loma area of San Diego and had discussed with White the financing possibilities for its construction. White then proceeded to advertise the project as an investment possibility in a local newspaper. This advertisement caught the eye of Mr. Howard Burke ("Burke"), who was also a San Diego realtor.

Burke contacted White and the latter sent to Burke a proposal dated March 8, 1978. Under this proposal, Nite Lite would construct a 157 unit motel and fifteen recreational vehicle spaces on a site in Point Loma which already included a restaurant and flower shop. Nite Lite would then sell the completed motel to a buyer-lessor subject to a 55-year ground lease for $2,200,-000.[2]

Nite Lite would then lease back the motel property for 29 years at a rental rate of $240,000 per year. Under this lease, Nite Lite would be extended an option to repurchase the motel property, at the end of an unspecified term, for $1,200,000 plus $120,-000 for every year the property was held by the buyer-lessor.

From March through August of 1978, negotiations proceeded between the parties with Burke representing Burke Investors and White and Grosvenor representing Nite Lite. Various proposals and counter-proposals were made during this period of time, as the parties continued in their attempt to structure an acceptable sale-leaseback.[3] Burke Investors, however, also wanted to perfect a tax-deferred exchange under Section 1031 of the Internal Revenue Code and sought to structure the agreement to achieve that tax treatment. *See* 26 U.S.C. § 1031.

On August 15, 1978, the Retirement Fund of the Plumbing-Heating and Piping Industry of Southern California ("PIPE") extended a $1,300,000 permanent loan commitment to Nite Lite ("the PIPE commitment"). This commitment envisioned a 20-year loan with an interest rate of 9¾% per year to be secured by a first trust deed on the motel property, a security interest in personalty on the motel property and the personal guarantees of several individuals, including Grosvenor. Among other things, the PIPE commitment required that union labor be used in the improvement of the motel property.

During August of 1978 the parties reached tentative agreement of the basic structure of their transaction. They would attempt to incorporate a tax-deferred exchange of properties held by Burke Investors into a purchase of the motel property by Burke Investors and concurrent leaseback to Nite Lite. Generally, this involved placing Burke Investors' exchange properties in escrow where they would be sold. A portion of the purchase price under the sale-leaseback, $1,100,000, would then be funded with these proceeds. Burke Investors would also assume the $1,300,000 PIPE loan. Under the leaseback, Burke Investors would receive as "rent", a 12% interest on

---

2. On March 28, 1978, Grosvenor and Nite Lite entered into a 55-year ground lease of the site discussed in White's proposal with Rose-Arena Properties, a California general partnership. The completed motel and underlying ground lease will hereafter be referred to as the "motel property".

3. The purchase price of the motel property remained at $2,200,000 during these early negotiations. However, later the price was raised to $2,400,000 and the repurchase option concept was eventually discarded at Burke's insistence.

the purchase price, or, 18% of the motel property's gross rental income, whichever was higher.

Burke and Grosvenor then retained counsel to assist and advise them in formalizing their agreement. Burke also took the added precaution of consulting a certified public accountant regarding the tax consequences to a partnership when that entity exchanged partnership properties for a ground lease and completed motel.

In September of 1978, Burke Investors paid to the Wallace Moir Co. the sum of $42,200 as a portion of the loan commitment fee demanded by PIPE. In return, Burke received (on behalf of Burke Investors) a promissory note in that amount signed by Grosvenor, on behalf of Nite Lite, and as the general partner in Nite Lite Inns-Ontario, a California limited partnership ("Nite Lite-Ontario"). Burke also received a trust deed encumbering an undivided one-half interest in property owned by Nite Lite-Ontario in Ontario, California ("the Nite Lite-Ontario property").[4]

Through September of 1978, the parties exchanged drafts of the documentation for the transaction. Continual refinements were made by counsel for the parties, including the elimination of a dual escrow device in the sale-leaseback and the decision to use a "straw man" to effect the Section 1031 exchange.[5]

B. *The Agreements*

Finally, in mid-October of 1978, the parties finalized the entire transaction in three agreements: (i) an "Exchange Agreement" dated October 12, 1978 ("the Exchange Agreement"); (ii) a "Contract" dated October 17, 1978 ("the Sale Agreement"); and (iii) a "Lease Agreement" dated October 17,

1978 ("the Lease Agreement"). The Exchange Agreement was entered into between Lynn McClean, Inc. ("McClean"), the entity that would act as the straw man, and Burke Investors. It provided that Burke Investors would exchange its interest in certain properties, valued at $1,100,000, in return for McClean's conveyance of the motel property, valued at $2,400,000 and subject to the ground lease, to Burke Investors. This would occur "on or about October 3, 1979, but no later than April 1, 1980 . . . ." The $1,300,000 PIPE loan would be assumed by Burke Investors under the Sale Agreement.

Under the Sale Agreement, Nite Lite would sell the motel property to Burke Investors for $2,400,000 payable $1,100,000 in cash (derived from the sale of the Burke Investors' exchange properties) and by Burke Investors' assumption of the $1,300,000 loan from PIPE. The properties placed into escrow by Burke Investors would also be pledged to secure a construction loan not to exceed $2,400,000.

The payments and transfers contemplated under the Sale Agreement were to be finalized upon the close of escrow, which was defined as either the filing of a Notice of Completion on the motel property, or, October 3, 1979, whichever was earlier. The close of escrow could be delayed, however, if the recording of the PIPE loan was postponed until the first quarter of 1980, or, if the closing was otherwise extended by mutual agreement.

The $1,100,000 received by Nite Lite from Burke Investors, under the Sale Agreement, would be disbursed in order to complete improvement of the motel property. This money would flow through the escrow and construction control fund maintained by the construction lender. Nite Lite

4. There is some dispute regarding the exact security given under this trust deed. Burke believed the interest secured under the trust deed to be worth in excess of $500,000. Grosvenor, on the other hand, evidently knew the trust encumbered a general partnership interest actually worth no more than $15,000.

5. This change was made upon the advice of another certified public accountant consulted by Burke. The "straw man" would act purely as a conduit for the transfer of interests to and from Burke Investors.

would pay all construction costs exceeding $2,400,000 and agreed to pay Burke Investors 10% interest per year on any of the $1,100,000 placed into escrow, from the date it was delivered until the close of escrow.

The $42,200 commitment fee (paid by Burke Investors) would be returned to Burke Investors "[i]n the event the Nite Lite [failed] to obtain financing for construction of the motel . . . ." And finally, the Sale Agreement prohibited the removal of the structures existing on the motel property (the restaurant and flower shop) until after escrow had closed.

The Lease Agreement, which became effective at the close of escrow, required Nite Lite, as lessee, to pay to Burke Investors as lessor, a base rent of $22,000 per month plus a "percentage rental" equal to "eighteen percent . . . of the gross rental income of the motel during such calendar [lease] year less a credit against such additional percentage rents equal to the amounts [sic] of the base rent of $264,000 per annum . . . ." This rental obligation would continue for a period of 29 years. At that time, Nite Lite was given an option to renew the lease for an additional 25-year period. The Lease Agreement would terminate altogether when the underlying ground lease expired at the end of 55 years.

The Lease Agreement was also characterized by the parties as a "net-net-net" lease, in that all rentals were net to Burke Investors and that Burke Investors would be responsible only for payments on the PIPE loan. Finally, the Lease Agreement granted Nite Lite a right of first refusal, in the event that any offer was made to purchase the motel property from Burke Investors.

### C. *The Collapse of the Transaction*

In November of 1978, construction began on the motel property. Burke Investors began placing its properties into escrow, and as they were sold, the proceeds were passed on to fund construction. As of mid-January of 1979, Nite Lite had received approximately $795,000 for construction purposes. Of that amount, $200,000 was derived from Burke Investors' exchange properties, while the other $595,000 had been advanced by Security Pacific National Bank ("the Bank").[6]

This advance was referenced in a document entitled "Building Loan Agreement" entered into between Nite Lite and the Bank, on February 15, 1979. This document also referenced a $1,300,000 construction loan secured by a trust deed on the motel property. The loan funds would be placed in a disbursement account to be disbursed by the Bank, as needed in the construction of the motel property. The total amount eventually placed in the account was $2,400,000, including a portion of the $1,100,000 Burke Investors was to contribute, and a subsequent amount borrowed by Nite Lite to round out that amount.

At this same point in time, problems began to arise in the development of the motel property. Heavy rains occurred in the San Diego area during the Spring of 1979, which delayed construction on the project for approximately three months. Also, throughout the construction period, there was a critical shortage of union construction labor. This was due to the heavy demand for construction workers in San Diego during that period of time. Burke was aware of the delays occasioned by these problems.

The Spring of 1979 also inaugurated a period of financial problems for Nite Lite and the onset of construction cost overruns. During this period, Nite Lite began paying only a few of its financial obligations, including a series of "loans" made by Grosvenor in lieu of his salary. After construction had resumed on the motel property, Grosvenor made a unilateral decision to "upgrade" the premises, paying particular attention to Nite Lite's corporate offices, which were to

---

6. Nite Lite required this advance, according to Grosvenor, because Burke Investors had en-countered some difficulty in completing the sales of the committed properties.

be located there. The Bank and Burke Investors were never formally notified of this action, which included changes in carpeting, the installation of synthetic marble in certain areas, the alteration of certain murals and the like.[7] The cost overruns, which eventually totalled $887,000, were initially brought to Burke's attention in August of 1979.

During the latter part of the construction period, Grosvenor, knowing that such action was expressly prohibited under the Sale Agreement, commenced remodeling efforts on the restaurant and later completely demolished the flower shop.[8] Burke was never advised of these actions and learned of them only after the fact.

The relationship between the parties began to deteriorate rapidly during the late Summer and Fall of 1979, although the improvements to the motel property had finally been completed and the motel had opened for business in August of 1979.[9] As of October 3, 1979, Burke Investors had deposited the sum of $799,296.85 into escrow. The construction cost overruns had precipitated the filing of mechanics liens on the motel property.[10] This eventually caused PIPE to withdraw its loan commitment, which meant that the escrow would not close under the Sale Agreement. During this same period Burke Investors, sensing the collapse of the entire deal, refused to commit any further funds into the escrow. Shortly after these developments, Nite Lite sought protection under the jurisdiction of this Court.

7. Grosvenor, who has apparently had a long-standing penchant for exotic motorcars, had Nite Lite lease a Rolls Royce and Mercedes 450 SL during the construction period. He also had Nite Lite acquire an Aero Commander airplane for corporate business. While the fate of the Aero Commander was never fully explained, Grosvenor claims to have sold the automobiles at cost when Nite Lite's financial circumstances became desperate.

8. Grosvenor had previously purchased the restaurant leasehold for $100,000 and had cancelled the lease. The purchase money was ultimately derived from Nite Lite.

## III

## DISCUSSION

### A. Generally

Basically, the dispute between the parties is as follows: Burke Investors contends that the transaction entered into between the parties was a bona fide sale-leaseback which Nite Lite breached. This, Burke Investors' claim, entitles it to a "lien" under Section 365(j) of the Code, in the amount of the purchase price it paid into escrow. Burke Investors contends that this amount should be augmented with interest and attorneys fees as provided for under Section 506(b) of the Code. 11 U.S.C. §§ 365(j), 506(b).

Burke also demands recovery of benefit of the bargain damages under Section 3306 of the California Civil Code for Nite Lite's alleged "bad faith" refusal to convey the property under the Sale Agreement. Cal. Civ.Code § 3306 (West). And finally, Burke Investors demands the return of the $42,200 commitment fee paid for the PIPE loan, contending that the Sale Agreement provides for this in the event that the commitment from PIPE was lost.

Naturally, Nite Lite views the extent of its liability differently. It contends that the sale-leaseback was a sham and was really nothing more than a disguised financing, or security arrangement. Accordingly, it would relegate Burke Investors' claim to that of an unsecured "lender". This would defeat any claim by Burke Investors to

9. Grosvenor, on advice of counsel, refused to execute security instruments and an assignment of interest covering the Nite Lite-Ontario property.

10. In a desperate attempt to salvage the transaction, Grosvenor attempted to procure a loan with the Bank of America to pay off the overruns. Burke Investors, though, would not agree to placing further liens on the motel property and the loan was never obtained.

secured status under Section 365(j) and thereby render moot the question of entitlement to attorneys fees and interest under Section 506(b).

Nite Lite further argues that Burke Investors is not entitled to benefit of the bargain damages under Section 3306 of the Civil Code and should receive only a reimbursement of the purchase price it paid, plus interest thereon. Nite Lite also differs with Burke Investors regarding the return of the $42,200 commitment fee paid to PIPE. It claims that any obligation to return the money to Burke Investors was conditioned on a failure to obtain construction financing, which was procured by Nite Lite.

Nite Lite also contends that it is entitled to an offset against any damages recovered by Burke Investors because of Burke Investors' "breach" of the Sale Agreement. This breach purportedly occurred when Burke Investors failed to deposit a total of $1,100,-000 into the escrow established under the Sale Agreement. The measure of Nite Lite's damages in this regard is said to be the difference between the interest rate Nite Lite was forced to pay on the money it borrowed from the Bank to fulfill the $1,100,000 cash requirement, and the rate of interest it was obligated to pay Burke Investors on the monies it should have placed in escrow.

## B. The Sale-Leaseback Question

The question of whether a sale-leaseback is bona fide, or, is merely a loan of money, has been considered by the California courts in the context of usury litigation. There, the focus has been on the question of whether a purported "sale" is merely a usurious loan. See e.g., Rochester Capital Leasing Corp. v. K & L Litho Corp., 13 Cal.App.3d 697, 91 Cal.Rptr. 827 (1970) (sale-leaseback). The issue has also been litigated extensively in the federal courts, particularly in the field of taxation. See e.g., American Realty Trust v. United States, 498 F.2d 1194 (4th Cir. 1974).[11]

The result has been the evolution of some well defined standards to guide the Court in making its determination. Due to the fact that this case involves the interpretation of contracts entered into in California, and relating to real property situated in this state, the Court must view the law of California as controlling. See Madsen v. Prudential Federal Sav. & Loan Ass'n, 635 F.2d 797, 802 (10th Cir. 1980); C.R. Fedrick, Inc. v. Borg-Warner Corp., 552 F.2d 852, 855 (9th Cir. 1977) (federal diversity action for breach of contract). The Court will also place substantial reliance, however, on the approaches taken by the federal courts in tax cases. Regardless of the standards employed, though, this determination will not be a mechanical one and will be controlled by the particular circumstances of this case. See e.g., Universal Drilling Co., Inc. v. United States, 412 F.Supp. 1231, 1235 (E.La. 1976).

Traditionally, the courts have looked to the intent of both parties to the transaction to determine whether they sought to effect a sale-leaseback, or, simply had designed a financing arrangement. See Universal Drilling Co., Inc. v. United States, supra, 412 F.Supp. at 1234-35; In re San Francisco Industrial Park, Inc., 307 F.Supp. 271 (N.Cal.1969). Under this inquiry, the Court must determine what the parties believed the legal effect of their transaction to be. See Oesterreich v. Commissioner of Internal Revenue, 226 F.2d 798, 801 (9th Cir. 1955); M & W Gear Company v. C.I.R., 446 F.2d 841, 844 (7th Cir. 1971).

The Courts have also focused on the economic substance of the transaction, and not merely the formal characterization, or labels, which the parties place upon their

11. A related line of case law has also been developed under the Uniform Commercial Code, around the question of whether a conventional lease constitutes a disguised security device. See e.g., In re Pacific Sunwest Printing, 6 B.R. 408, 30 U.C.C.Rep. 39 (Bkrtcy.S.Cal. 1980).

arrangement. *See Helvering v. Lazarus & Co.*, 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939); *In re Berez*, 646 F.2d 420 (9th Cir. 1981); *Rochester Capital Leasing v. K & L Litho Corp., supra*, 13 Cal.App.3d at 701–02, 91 Cal.Rptr. 827. In the California usury cases, the courts have looked beyond the form of a transfer which is ostensibly a "sale" (the transfer of property for a price), to the economic realities of the transaction. This may reveal that the transfer is actually a loan (a delivery of money with the obligation to repay that sum plus interest). *See e.g., Golden State Lanes v. Fox*, 232 Cal.App.2d 135, 138–39, 42 Cal.Rptr. 568 (1965).

The federal tax cases involving sale-leasebacks have also looked to the substance of the transfers involved, but have centered on the "lessor-lessee" relationship purportedly created in the leaseback. The United States Supreme Court recently added a new dimension to the application of this principle when it decided *Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978).

There, the Court was confronted with a complex factual setting requiring them to determine the tax consequences resulting from a transaction which was styled as a sale-leaseback, but was challenged by the Internal Revenue Service as being merely a loan. In concluding that the arrangement before it was a bona fide sale-leaseback, the Court stated: "so long as the lessor retains significant and genuine attributes of the traditional lessor status, the *form* of the transactions adopted by the parties governs for tax purposes. What those attributes are in any particular case necessarily depends on its facts." *Frank Lyon Co. v. United States, supra*, 435 U.S. at 584, 98 S.Ct. at 1303 (emphasis added).

While the Court in *Frank Lyon* extended a new deference to the form in which the transaction is cast, it is clear that the underlying facts and realities in that case were closely examined. As the Court noted, the question of whether a sale-leaseback is bona fide requires a determination that the purchaser-lessor has actually assumed, to a significant degree, the benefits *and burdens* of traditional landlord status.

In this regard, the Court must consider: (i) whether the leaseback actually transfers the normal risks and responsibilities of lessor status to the purchaser-lessor and (ii) whether the "rentals" paid by the seller-lessee are reasonably designed to compensate the lessor for the use of the property, or, simply reflect a repayment of the lessors' acquisition cost plus interest. *See Sun Oil Co. v. C.I.R.*, 562 F.2d 258, 263–67 (3rd Cir. 1977); Rev.Rul. 72–543, 1972—2 C.B. 87 (sale-leaseback of ship).[12]

The evidence of the parties intent in this transaction is somewhat equivocal. On the one hand, throughout their negotiations, Nite Lite and Burke Investors referred to their agreement as a sale-leaseback. Furthermore, all the documentation created by their lawyers reinforced this preference.

On the other hand, individuals bent on disguising the true nature of their business dealings can hardly be expected to disclose their unstated intentions, especially in the writings they create. Additionally, Grosvenor's testimony contains several references to his overriding concern to obtain "100% financing" for his motel project. In this respect, Grosvenor viewed the sale-leaseback as a convenient device to procure the "loan" he required to develop the motel property. Also, Burke characterized the in-

---

12. Other factors, such as the existence of a "nominal" repurchase option and a marked disparity between the purchase price of the property and its fair market value have also been considered relevant. *See* Marcus, *Real Estate Purchase-Leasebacks as Secured Loans*, 2 Real Est.L.J. 664, 669–75 (1974) ("Marcus"). Here, though, Nite Lite did not retain an option to repurchase, only a right of first refusal. The lack of an option to purchase, however, does not necessarily preclude a finding that the lease was actually a disguised secured loan. *See In re Berez, supra*, 646 F.2d at 421. Additionally, the evidence before the Court indicates that the parties agreed that the $2,400,000 purchase price accurately reflected the fair market value of the property.

tent of Burke Investors in this transaction as that of a "passive investor", looking only for a secure and profitable return on their invested capital. These remarks indicate that Burke Investors was not interested in obtaining any of the attributes of ownership which traditionally attend to landlord status. Burke Investors was simply concerned with effecting a tax-deferred exchange which would result in a profitable investment. Converting the exchange properties into cash and then "lending" the money to Nite Lite looked like a convenient way to achieve this end.

■ When the underlying economic substance of the leaseback is examined it becomes clear that this transaction was merely a disguised financing arrangement. Burke Investors did not retain any significant attributes of traditional lessor status under the Lease Agreement. For all practical purposes, Nite Lite was the "owner" of the motel property despite the transaction.

First, the parties expressly referred to the Lease Agreement as a "net-net-net" lease. This meant that the "lessee-seller", Nite Lite, was responsible for payment of all real estate taxes, the procurement of fire and liability insurance and the undertaking of repairs and maintenance of the motel property, at no cost to Burke Investors. *See Marcus, supra,* 2 Real Est.L.J. at 665 n.3. Second, under the Sale and Lease Agreements, Burke Investors' only real responsibility was to repay the PIPE loan. While the underlying ground lease had been assigned to Burke Investors, the obligation to pay rent thereunder remained with Nite Lite under the Lease Agreement. Third, Nite Lite was to pay all utility costs associated with the motel property. Fourth, Nite Lite was granted a broad right to alter or

modify the motel property after notice had been given to Burke Investors.[13] Fifth, Nite Lite was to keep the motel property free and clear of all mechanics liens and was to indemnify Burke Investors as to all liability resulting from violations of applicable laws, or, from personal injury or property damage liability.[14]

With respect to the question of "rentals" it is clear that the "rent" charged under the Lease Agreement did not simply reflect fair compensation for the use of the motel property. It was designed to amortize Burke Investors' costs in purchasing the motel property and also provide a rate of return on that investment. This becomes apparent when the amount expended by Burke Investors (in cash and the assumption of the PIPE loan) is compared with the projected return under the minimum and percentage rental provisions in the Lease Agreement. *See Sun Oil Co. v. C.I.R., supra,* 562 F.2d at 265–67. This factor has also been found persuasive by the California courts in determining that "rent" paid under a sale-leaseback was really only a usurious loan payment. *See Rochester Capital Leasing Corp. v. K & L Litho Corp., supra,* 13 Cal.App.3d, at 702, 91 Cal.Rptr. 827.

Given all these factors, the Court must conclude that the arrangement between Burke Investors and Nite Lite was intended to provide a loan to Nite Lite to improve the motel property. The parties never intended an absolute transfer of the motel property, Burke Investors simply advanced money to Nite Lite in return for Nite Lite's promise to repay that sum over a period of time plus interest.

Had the transaction been fully consummated, Burke Investors would have contributed cash and assumed payment under the

**13.** In connection with this right, the Lease Agreement provides that: "In the event Lessor finances said construction it shall receive the same percentage return on its additional invested capital as provided in this lease."

**14.** Condemnation awards, however, would be payable to Burke Investors under the Lease

Agreement. This is normally regarded as a criterion of "ownership". *See Sun Oil Co. v. C.I.R., supra,* 562 F.2d at 263–65, 269. The Lease Agreement also gave Burke Investors a right of entry, but only upon the occurrence of a default by Nite Lite.

PIPE loan, for this, it would have received full repayment of its "acquisition" costs, plus a favorable percentage return. This repayment took the form of "rentals" under the Lease Agreement. None of the benefits and burdens of actual ownership were imposed upon Burke Investors. In short, beneficial ownership of the motel property never left Nite Lite, only mere legal title, which Burke Investors simply held as a mortgage.

### C. The Impact of Sections 365(j) and 506(b)

Section 365(j) of the Code provides:

(j) A purchaser that treats an executory contract under subsection (i) of this section, or a party whose executory contract to purchase real property from the debtor is rejected and under which such party is not in possession, has a lien on the interest of the debtor in such property for the recovery of any portion of the purchase price that such purchaser or party has paid.

11 U.S.C. § 365(j). The effect of this section is to confer upon certain vendees of real property, secured status, to the extent of the purchase price they have paid to the vendor. Matter of 18th Ave. Development Corp., 10 B.R. 1 (Bkrtcy.S.Fla.1980). 2 Collier on Bankruptcy, ¶ 365.10[1] (15th ed.) ("Collier"). To become entitled to lien status under this section, one must be a "purchaser" under an "executory contract to purchase real property ...." 11 U.S.C. § 365(j). The Code defines "purchaser" to include any "transferee of a voluntary transfer ...." See 11 U.S.C. § 101(32).

▮ In this case, Burke Investors has adopted the paradoxical contention that it was not a secured lender under the sale-

leaseback, in order to be afforded secured status under Section 365(j). Having now determined that Burke Investors was indeed only a "lender" under that transaction, and not a true vendee, it cannot be considered a "purchaser" entitled to lien status under Section 365(j). Despite the breadth of the term "purchaser" under the Code, Section 365(j) was clearly not intended to encompass nominal "purchaser-lessors" under sale-leasebacks who simply hold legal title for security purposes. Rather, secured status under Section 365(j) was intended to protect bona fide vendees of ownership interests in real property. See generally H.R. Rep.No.95–595, 95th Cong., 1st Sess. 349–50 (1977); S.Rep.No.95–989, 95th Cong., 2d Sess. 60 (1978) U.S.Code Cong. & Admin. News, 5787; 2 Collier, supra, ¶ 365.10.

▮ This conclusion also disposes of Burke Investors' contention that it is entitled to attorneys fees and interest under Section 506(b). This section provides for the recovery of interest on allowed over secured claims and for "reasonable [attorneys] fees [and] costs ... provided under the agreement under which such claim arose." 11 U.S.C. § 506(b). Here, Burke Investors is not entitled to interest or attorneys fees on its claim because it did not attain any secured status under Section 365(j).[15]

### The Availability and Extent of Damages Under Section 3306 of the California Civil Code.

Here, Burke Investors argues that the measure of its claim for damages for Nite Lite's failure to convey the motel property is governed by Section 3306 of the California Civil Code. This section provides:

Breach of agreement to convey real property. The detriment caused by the

---

15. Given this conclusion, the Court need not decide the question of whether secured status under Section 365(j) confers the right to recover interest and attorneys fees under Section 506(b). With respect to attorneys fees, however, the Court would observe that a lienholder under Section 365(j) would evidently not be entitled to attorneys fees under Section 506(b).

The latter section contemplates an award of fees premised on the agreement which created the secured claim. See In re Carey, 8 B.R. 1000, 7 B.C.D. 310 (Bkrtcy.S.Cal.1981). The lien provided by Section 365(j), however, is not consensual, it is a statutory lien right created by Congress.

breach of an agreement to convey an estate in real property, is deemed to be the price paid, and the expenses properly incurred in examining the title and preparing the necessary papers, with interest thereon; but adding thereto, in case of bad faith, the difference between the price agreed to be paid and the value of the estate agreed to be conveyed, at the time of the breach, and the expenses properly incurred in preparing to enter upon the land. Cal.Civ.Code § 3306 (West).[16]

■ Normally, recovery under this section is confined to a reimbursement of the purchase price paid by the vendee, plus interest. In the case of "bad faith" conduct by the vendor, however, a vendee can recover additional benefit of the bargain damages as defined in the statute. See 1 B. Witkin, *Summary of California Law* "Contracts" §§ 659–60 (8th ed. 1973).

■ The contours of "bad faith" conduct are well defined. Bad faith under Section 3306 consists of any refusal to perform by the vendor without just cause or valid legal excuse. It also includes negligent conduct by the vendor which deprives him or her of the ability to perform. Fraud, however need not be shown. See *Collins v. Marvel Land Co.*, 13 Cal.App.3d 34, 42, 91 Cal.Rptr. 291 (1970); *Rasmussen v. Moe*, 138 Cal. App.2d 499, 503, 292 P.2d 226 (1956); *Mercer v. Lemmens*, 230 Cal.App.2d 167, 173, 40 Cal.Rptr. 803 (1964). Burke Investors contends that it should be reimbursed for the purchase money it paid into escrow, with interest, plus benefit of the bargain damages for Nite Lite's alleged bad faith conduct.

1. *Reimbursement of the Purchase Money Plus Interest*

Nite Lite does not dispute the fact that Burke Investors is entitled to a claim for damages equal to the reimbursement of the purchase price it paid into escrow. Nor does Nite Lite dispute the availability of interest on that amount.[17] Nite Lite does, however, correctly contend that interest on the damages under Section 3306 should not accrue beyond December 7, 1980, the date Nite Lite filed its Chapter 11 petition.

Under the former Bankruptcy Act, claims generally stopped bearing interest at the filing of the petition, see e.g., *In re Petite Auberge Village, Inc.*, 650 F.2d 192, 194 (9th Cir. 1981), and post-petition interest was available only in a narrow class of cases. See *In re Waller*, 3 B.C.D. 78 (S.Cal.1977) (solvent estate). This philosophy is simply "a rule of convenience providing for equality in distribution", see 3 *Collier, supra*, ¶ 502.02[2] at 502–29, was carried over into the Code under Section 502(b)(2). 11 U.S.C. § 502(b)(2). See also *In re Standard Furniture Co.*, 3 B.R. 527, 6 B.C.D. 270 (Bkrtcy.S. Cal.1980). Under the Code, post-petition interest is treated as "unmatured interest" and is not recoverable. 11 U.S.C. § 502(b)(2); 3 *Collier, supra*, ¶ 502.02[2].[18]

Unless Burke Investors is entitled to "bad faith" damages then, its claim under Section 3306 should be limited to reimbursement of the purchase money it paid into escrow, plus interest. The interest would be computed at a rate of 10% per year, running from the date of deposit to the filing of the petition on December 7, 1980.

2. *Benefit of the Bargain Damages For Bad Faith Conduct*

Burke Investors charges that Nite Lite breached the Sale Agreement in "bad faith" because it negligently incurred construction cost overruns which led to the attachment of mechanics liens on the motel property

---

**16.** The conveyance of a leasehold interest under a term for years plus improvements, would constitute "an estate in real property" under this section. See Cal.Civ.Code § 761 (West).

**17.** Nite Lite apparently concedes that the 10% rate of return specified in the Sale Agreement governs under Section 3306.

**18.** The exceptions allowing claims for post-petition interest, were also carried over into the Code, see 3 *Collier, supra*, ¶ 502.02[2] at 502–32, but are not applicable here.

912

and the loss of the PIPE loan. Burke Investors argues further that Nite Lite failed to pay for construction cost overruns, knowingly demolished the flower shop in violation of the Sale Agreement and willfully failed to execute security instruments concerning the Nite Lite-Ontario property.

█ In addressing each of these claims, it must be remembered that the existence of "bad faith" under Section 3306 is a factual question which is dependent on the particular circumstances of the case. *See e. g., Engasser v. Jones*, 88 Cal.App.2d 171, 176, 198 P.2d 546 (1948). The burden of proving that Nite Lites' conduct amounted to bad faith, is on Burke Investors. *See Robertson v. Bogert*, 130 Cal.App.2d 639, 645, 279 P.2d 572 (1955).

To begin with, the upgrading action taken by Nite Lite has apparently benefitted the motel property with resulting higher occupancy rates and increased room charges. Grosvenor made these changes in the exercise of his own good faith business judgment. He did not want the motel property to convey a "budget motel" image and he believed the changes were necessary to accomplish this goal. Second, the amounts spent in upgrading were not excessive in relation to the total construction cost overruns. Apparently, the rain delays, labor shortages and increased union labor costs experienced by Nite Lite were the chief causes of the overruns. The delays and shortages were, of course, beyond Nite Lite's control, while the cost of union labor was a factor which neither party had considered.

Third, while it is true that Nite Lite did not pay the cost overruns as required under the Sale Agreement, Grosvenor did make a good faith attempt to do so and did not ignore the problem. Fourth, while Grosvenor did demolish the flower shop (which he concedes was a technical breach of the Sale Agreement), this action was taken because

of the on-site availability of demolition equipment (due to regrading), and, the eventual need to regrade the entire site to improve drainage. And finally, Grosvenor's refusal to execute the security instruments pertaining to the Nite Lite-Ontario property was done in good faith reliance, on the advice of counsel. This conduct cannot amount to bad faith under Section 3306. *See Fox v. Aced*, 49 Cal.2d 381, 385–86, 317 P.2d 608 (1957).

█ As a starting point, it is clear that none of the problems which Nite Lite or Grosvenor had control over, were deliberately created in order to breach the Sale Agreement. Nor can the disintegration of the parties business relationship be traced solely to mistaken judgment, or negligent conduct engaged in by Grosvenor. Unquestionably, some of Grosvenor's conduct (on behalf of Nite Lite) was negligent and some of the judgments he made were imprudent or mistaken. The problems that were encountered by the parties here were created by many converging causes, several of which were beyond anyone's control. For these reasons, the Court has concluded that Grosvenor and Nite Lite did not engage in "bad faith" conduct under Section 3306 and Burke Investors is not entitled to benefit of the bargain damages.

E. *The Status of the PIPE Commitment Fee*

Here, Burke Investors attempts to recover the $42,200 commitment fee it paid to PIPE under ¶ 2.4 of the Sales Agreement. This provision reads:

2.4 It is acknowledged that Nite Lite received $42,200 as loan commitment fees from McLean. In the event that Nite Lite fails to obtain financing for *construction* of the motel, this sum of $42,200 shall be paid to McLean. In the event that the Lender insists upon an additional loan fee in addition to the $15,000 paid by Nite Lite and the aforesaid $42,200, paid

by McLean, McLean shall pay said fee up to $13,000 at close of escrow.

(emphasis added).[19]

Burke Investors argues that this provision entitles it to repayment of the $42,200 upon the loss of the PIPE loan. Nite Lite, on the other hand, contends that repayment was contingent only upon its failure to obtain construction financing. That financing, Nite Lite points out, was obtained from the Bank.

 Nite Lite's argument is well taken. Under the law of contracts as developed in California, this Court is bound to interpret an agreement as written, where the contract language is clear and explicit. *See* Cal.Civ.Code § 1638 (West); *Matter of Beverly Hills Bancorp*, 649 F.2d 1329, 1333 (9th Cir. 1981).[20] Such is the case here, and the Sale Agreement clearly conditions repayment of the commitment fee on a failure to obtain construction financing. Since Nite Lite did procure that financing through the Bank, Burke Investors is not entitled to a refund of the commitment fee.

F. *Nite Lite's Entitlement to An Offset for Damages Caused by Burke Investors Breach of the Sale Agreement*

Nite Lite also seeks damages based on a "material breach" of the Sale Agreement by Burke Investors. The breach allegedly occurred when Nite Lite refused to commit a total of $1,100,000 into escrow as "required" by the Sale Agreement. In this regard, Nite Lite relies on ¶'s 2.1 and 3 of the Sale Agreement. They provide in part:

2.1 McLean shall purchase the ground lease and completed motel for $2,400,000. Payment shall be made $1,100,000 in cash as the properties described in Exhibit "A" are sold but no later than *on or before*

*close of escrow* described in paragraph 3 and upon completion and conveyance of the completed motel, McLean agrees to assume Nite Lite's permanent loan of $1,300,000 as further described in paragraph 7.

\* \* \* \* \* \*

3. *Escrow.* Upon execution of this agreement, the parties shall open an escrow ... for the conveyance of the properties and disbursement of funds required by this Agreement. Escrow shall close upon filing of the Notice of Completion of the motel or on October 3, 1979, whichever is earlier, unless delayed by the recording of the permanent loan into the first quarter of 1980, or on such other date as mutually agreed. In no event shall escrow close prior to March 11, 1979.

Nite Lite construes these provisions to require funding *prior* to October 3, 1979, which it terms as "the date set by the Sale Agreement for close of escrow...." The measure of damages for this breach is said to be an amount equal to the difference between the interest rate charged by the substitute lender of the funds Burke Investors did not contribute (the Bank), and the lower interest rate Nite Lite was obligated to pay Burke Investors on the funds it deposited into escrow.

The threshold question is whether Burke Investors' failure to fully commit its funds to the escrow prior to October 3, 1979, is a breach of the Sale Agreement. The Court has concluded that it is not.

 The Sale Agreement required Burke Investors to contribute $1,100,000 in cash no later than "on or before the close of escrow [as] described in paragraph 3 ...." The close of escrow under ¶ 3, occurred either upon the happening of a specified

---

19. Burke Investors impliedly contends that this provision modified Nite Lite's obligations under the earlier note and trust deed pertaining to the Nite Lite-Ontario property. Since Burke Investors has not pursued recovery under the security instruments (evidently because they view

the security given as insufficient) the Court will only consider ¶ 2.4.

20. Burke Investors' suggestion that this provision contains a drafting or typographical error is not credible.

event, or, at a date certain, whichever came first, unless, recording of the PIPE loan had not yet occurred, in which case the escrow could *not* close until the PIPE loan recorded. Here, the PIPE loan *never* recorded, because the PIPE commitment was withdrawn.

The "on or before" provision in ¶ 2.1 had the effect of extending to Burke Investors a limited option on the tender of its performance under the close of escrow provision. *See Chicago Railway Equipment Co. v. Merchants' Bank*, 136 U.S. 268, 285, 10 S.Ct. 999, 1003, 34 L.Ed. 349 (1889) ("on or before" provisions in negotiable instruments). In other words, under ¶ 2.1, Burke Investors had the option of performing *prior* to the close of escrow, or, waiting until it was under an absolute legal duty to perform. Burke Investors was not contractually obligated to commit all of its funds until the "close of escrow", which never occurred here because of the failure of the PIPE loan to record.

Therefore, Burke Investors' failure to act as of October 3, 1979 did not create a right to damages in Nite Lite. Furthermore, the failure of the PIPE loan to record meant that Burke Investors' duty of performance never ripened under ¶ 2.1 of the Sale Agreement. *See* 3A *Corbin on Contracts* § 656 at p. 147. Without any breach, no damages accrued to Nite Lite to use as an offset.

## IV

## CONCLUSIONS

1. The sale-leaseback transaction was not bona fide and was merely a loan.

2. Burke Investors is not entitled to a lien under 11 U.S.C. § 365(j), or interest and attorneys fees under 11 U.S.C. § 506(b).

3. Burke Investors' recovery under Section 3306 of the California Civil Code is limited to the purchase price it paid into escrow, plus interest at 10% per year computed from the date of deposit to December 7, 1980.

4. Burke Investors is not entitled to recover the $42,200 commitment fee paid to PIPE.

5. Nite Lite is not entitled to an offset against damages owing to Burke Investors.

Counsel for Nite Lite will prepare an appropriate judgment within fourteen (14) days of the date of this opinion. This opinion shall constitute findings of fact and conclusions of law as required by Bankruptcy Rule 752.